The **EVENING NEWS PUBLISHING COMPANY**, a corporation of the State of New Jersey, Plaintiff,

v.

**ALLIED NEWSPAPER CARRIERS OF NEW JERSEY**, a corporation of the State of New Jersey, et al., Defendants.

Civ. A. No. 110–57.

United States District Court
D. New Jersey.
March 24, 1958.

---

3. See my earlier opinion in this case on the production of Grand Jury minutes, footnote 4. 159 F.Supp. 860, at page 862.

**570**

Gilhooly, Yauch & Fagan, Edward J. Gilhooly, Newark, N. J., Riker, Emery & Danzig, Charles Danzig, Newark, N. J., of counsel, for plaintiff.

Eisenberg & Spicer, Jerome C. Eisenberg, Ralph Neibart, Newark, N. J., for defendants.

WORTENDYKE, District Judge.

In this action, under jurisdiction conferred upon this Court by §§ 4 and 26 of Title 15 of the United States Code Annotated, plaintiff sought injunctive relief, interlocutory and permanent, against continuance by defendants of charged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2). Upon the filing of the complaint on February 14, 1957 the case was referred to the late Hon. Alfred E. Modarelli, then a Judge of this Court, before whom all proceedings herein were had through the presentation of the evidence upon which, on June 18, 1957, he granted an interlocutory injunction in accordance with the prayers of the complaint. An earlier application for such preliminary relief, made to Judge Modarelli on return of the order to show cause, which was allowed upon the filing of the complaint, was denied by him on March 21, 1957. His opinion upon which such denial was based was filed March 15, 1957, and is reported in 149 F.Supp. 460. After completion of the presentation of the evidence upon which the preliminary injunction issued, leave was granted to defendants to serve and file an additional brief, and to the plaintiff an answering brief, after transcription of the testimony and before final determination of the cause; but Judge Modarelli died before such briefs came in, and the case was thereafter reassigned to the writer of this opinion for appropriate disposition. Briefs have been submitted to, and oral argument of counsel has been heard by this writer. During the course of such argument counsel for the defendants adopted the factual summary embodied in the plaintiff's main brief, withdrew the affirmative defenses pleaded in their answer, while continuing to assert the lack of jurisdiction of this Court to award relief under the circumstances, and raised a question as to the sufficiency of the complaint. However, defendants concede that the actions and refusals to deal complained of by the plaintiff resulted from an agreement and combination of the individual defendants (Dealers) through their membership in the corporate defendant (Allied).

### The Business of the Plaintiff.

In the interest of expedition and succinctness we follow the defendants' lead by borrowing from a summarization at pp. 7-9 of plaintiff's main brief:

"The plaintiff publishes a daily newspaper known as The Newark Evening News, having a net average daily paid circulation of 290,000 copies. Plaintiff also publishes a Sunday paper known as The Newark Sunday News with a net average paid circulation of 335,000 copies. Plaintiff's principal place of business is 215 Market Street, Newark, New Jersey. The facilities located there are capable of producing 150,000 more papers than are presently produced. The news published by the paper is gathered from all corners of the world. A good deal of it comes through wire services such as the Associated Press, United Press and International News Service. The plaintiff's own correspondents (its own employees and feature writers) are sent to all parts of the world

where news may be in the making or imminent. The newsprint on which the paper is printed comes from Finland and Canada by way of water and rail and is transported from the docks or freightyards to its printing presses by trucks. The magazine section for the Sunday paper is printed in Louisville, Kentucky, and the colored comics in the Sunday paper is printed in Bridgeport. Both the magazine section and the colored comics section are delivered to the reader as an integral part of the Sunday paper. The comics appearing in both the daily and Sunday editions come from all over the country. The advertising appearing on its pages is received from practically the entire United States and at times even from foreign countries. Plaintiff's papers go to every state in the Union.

"The greater the circulation, the higher the rate the plaintiff can charge for advertising. A decrease in circulation of 4% or 5% would raise questions in the minds of advertisers and perhaps result in a reduction of advertising rates. If the circulation increases, rates increase proportionately. A loss in circulation of 20,000 would affect advertising if such a decline was protracted or if there were recurrent stoppages. * * *

"Plaintiff delivers its papers to its customers in the following manner:

"a. By means of its own trucks to newsstands and stores;

"b. By rail and other carriers to points within and outside the State of New Jersey;

"c. By mail to its subscribers within and outside the State of New Jersey;

"d. By street sales through newsboys;

"e. By means of its own trucks to various braches maintained by it and to other points and from which points further distribution is made through newsboys;

"f. By means of its own trucks to Home Delivery Dealers.

"The published price of the daily is 5¢ and of the Sunday edition is 12¢. The plaintiff sells its papers to Home Delivery Dealers as well as newsboys for $3.80 per hundred for daily and $9.00 per hundred for Sunday editions. The papers distributed through Home Delivery Dealers throughout the State of New Jersey amount to 62,878 daily editions and 70,631 Sunday editions of the total circulation, or better than 20% of the total circulation * * * The dealer can charge what he likes for the service he renders and this is also true of the newsboys. * * *"

The Business of the Defendant
Home Delivery Dealers.

As stated at page 3 in the brief for defendants:

"The individual defendants are independent small business men. They own their delivery routes and use their own vehicles in distributing papers. Many of them operate their businesses from their homes; others operate candy stores or similar enterprises in conjunction with the home delivery of newspaper."

As further summarized in the brief for the plaintiff at pp. 12–17:

"Of the 33 dealers who responded to the plaintiff's call on the first day of trial, one operated in Hudson County, two in Morris County, three in Union County, one in Monmouth County and the balance in Essex. All of them owned and operated in their business a truck or other type of automobile for delivery purposes. Some owned and operated as many as two trucks plus one or two station wagons; others, in addition to the trucks or other automotive equipment they owned or operated, hired additional motor vehicles. Some were in business a short time. One

dealer, McGuire, purchased a route and started in business as a dealer in February, 1957. Most of them, however, were in business for many years. One of them testified he was in the Home Delivery business all his life. All of them employed newsboys to assist them in the delivery of the papers to their customers. Of the 33 called to the stand by the plaintiff only two of the dealers each employed one newsboy for daily deliveries, but of these two dealers who each employed one for daily deliveries, one of them employed as many as seven for Sunday deliveries while the other employed two for Sunday deliveries. One dealer employed two and another employed three newsboys to service his customers. All of the others employed three or more for both daily or Sunday deliveries. Most of them employed in excess of three boys. Six of them actually employed ten or more boys. The dealers pay self-employment taxes, workmen's compensation premiums on their boys and some transact their business in corporate form. The membership of Allied is statewide.

"All of the Home Delivery Dealers except one delivered morning papers. The Newark Evening News published by the plaintiff is an evening paper and was distributed only in the afternoon or evening and on their evening routes all of the Home Delivery Dealers delivered other papers in addition to the plaintiff's papers. The percentage of other papers delivered by most of the dealers in the afternoons during the week was small compared to the number of plaintiff's papers.

"On Sunday, the Home Delivery Dealers delivered not only the Newark Sunday News published by the plaintiff but also many other papers besides. The percentage of other papers than the plaintiff's papers delivered by these 33 Home Delivery Dealers on Sunday was substantial, ranging from a low of 15% to a high of 68%. The percentage of other papers delivered on Sundays by most of these 33 dealers, however, was between 40% and 60%. Or, to put it differently, somewhere between 40% and 60% of the total papers delivered by these 33 dealers on Sundays consisted of papers other than plaintiff's Sunday News. Nearly all of the dealers had purchased their route from some predecessor in the business. Some had inherited or married into the business. Only one (Gutowski) had gone out and developed his own route. The value of a customer can be ascertained from the fact that one dealer (Herman Amsterdam) sold in 1956 a route consisting of 600 daily and 500 Sunday papers for the sum of $7,-000. This would put the price at a little better than $1.00 per customer for a unit consisting of a daily and Sunday paper. The dealers admitted the business they operated to be their own property which they are free to sell. They buy or sell customers and have done so without any leave, permission or approval of the plaintiff. When a purchase or sale is made, the new owner makes a deposit with the News to secure the balance of his bills and the deposit of the seller is returned to him. The plaintiff exercises no control with respect to such purchases or sales. Most of the dealers have on deposit with the News a sum sufficient to cover only one week's deliveries. Purchasers from old dealers are now required to have on deposit a sum sufficient to cover three weeks' purchases. Despite this requirement of a three-week deposit from purchasers from old dealers, concessions are made by the plaintiff. Thus when one of the defendants (Wrobel) sold his route to McGuire, the new purchaser only had $225.00 to meet a three-week deposit requirement of $600. The plaintiff accepted the $225 and per-

mitted McGuire to build up his deposit account to $600 at the rate of $50 per month. At the time the case was tried, the average dealer was 10 weeks in arrears. A year ago, he was only six weeks in arrears in the settlement of his accounts. The deposit is inadequate security to offset these arrearages. Nevertheless, the plaintiff has done nothing to compel the dealers to increase their deposit or liquidate their arrearages. * *

"The price that the Home Delivery Dealer charges his customers varies with each dealer and on occasion varies for the customers of a particular dealer depending on the accessibility and ease of delivery. The price varies from 50¢ to 68¢ for six daily and one Sunday paper. The wholesale price of $3.80 per hundred for daily and $9.00 a hundred for Sunday papers is uniform to all dealers and the plaintiff does not dictate the dealer's price to his customers. * * *

"The dealers claim that their business is threatened by competition from newsboys selling at 50¢ a week in their territories is refuted by comparison of the amount of papers purchased by them in 1950 and 1957. The average for the first week of the month of April in 1950 of the amount of papers purchased from the News by all dealers for distribution to their customers was 55,970 daily and 50,919 Sunday editions. The purchase of papers for the same period in the month of April, 1957 was 62,878 daily editions or an increase of approximately 7,000 papers over this seven-year period. The Sunday papers taken by all dealers for the same period in April, 1957, amounted to 70,631, as against a draw of 50,919 in the same period in April 1950, or an increase of almost 20,000 Sunday papers. The number of Home Delivery Dealers through this seven-year period remained about the same * * * [D]uring Mr. Healy's incumbency as General Manager of the Circulation Department, he has run a number of campaigns to obtain customers for the dealers as part and parcel of his job of increasing the circulation of the newspaper. These campaigns were run at the expense of the plaintiff and on all occasions, except when a statewide campaign was being run, the price to the customer was always the price fixed by the dealer. In state-wide campaigns, the plaintiff did not feel that it could run a state-wide campaign and charge one price in one place and another price in another area and such state-wide campaigns were always at a uniform price, namely 50¢ per week. If the dealer did not wish to accept the customer at such a price, he was free to decline and at no time when a dealer declined to accept a customer at 50¢ per week was he threatened to be cut off. All customers turned over to the dealer became the dealer's property. Despite the fact that the cost of the campaign was borne by the plaintiff the plaintiff never checked to see if the dealer increased the price as they did in many instances. Thousands of customers were turned over to the dealers by the plaintiff as a result of these campaigns but in one instance one dealer turned down 70 new customers not because of the price but because the customers lived in a low-income area. If a reader complains about the charge a dealer makes, the plaintiff lets the dealer take care of it and does not suggest a reduction in price. * * *

"The New York Sunday and daily papers that are delivered by the Home Delivery Dealers are handled under a procedure that is known as the Mansfield System. The Mansfield System consists of an office in New York that allocates territories to be serviced by Home Delivery Dealers. This amounts to zoning and one delivery dealer will not deliver papers in the zone of another. Under the

Mansfield System, no delivery dealer, newsboy or store can sell New York papers in any zone without the prior approval of the Mansfield office. This system the dealers have urged from time to time that the plaintiff adopt as a means of terminating the controversy between plaintiff and the dealers. These requests were rejected by the plaintiff on the ground it believed in free competition."

### What Precipitated the Litigation.

On February 15, 1956 James L. Hutchings,—then President of an unincorporated association of Home Delivery Dealers which subsequently merged into Allied,—in company with approximately 17 of the members of his association, conferred with plaintiff's Circulation Director and registered a complaint regarding late deliveries by the plaintiff to the Dealers. The Dealers threatened to discontinue the handling of plaintiff's newspaper unless they received earlier deliveries thereof. In response to these complaints, plaintiff undertook to improve its delivery service to the Dealers. Subsequently, between February 15 and July 13, 1956, Mr. Hutchings, as spokesman for the Dealers, made demand of plaintiff's Circulation Director that all newsboys who were delivering plaintiff's newspaper within the territory of any of the Dealers should be forced out of business by plaintiff's discontinuance of selling newspapers to these boys. Plaintiff refused to yield to this demand and was again threatened by the Dealers' spokesman with a "strike" of such Dealers against the handling of plaintiff's newspapers. Upon another occasion, between the dates stated, the representatives of the Dealers demanded that plaintiff "shut out" any distributor other than the newspaper man or Dealer in his particular area. The Dealers had, in this connection, allocated the aggregate territory among themselves, but they demanded that the plaintiff force newsboys out of the respective territories served by the Dealers. On July 13, 1956, Mr. Hutch-

ings, with a group of the Dealers, and the attorney who represented them during the trial of this action, again conferred with plaintiff's Circulation Director, to whom they delivered an ultimatum that unless the plaintiff discontinued the use of newsboys for the distribution of its newspaper the Dealers would no longer handle it. Plaintiff refused to accede to this demand, and, on the same day, the Dealers refused to accept from plaintiff delivery of its newspaper. Confronted with this refusal, plaintiff immediately adopted the best type of substitute distribution service available in order to get its papers to its readers by increasing its store deliveries in the Dealers' areas and instituting delivery service through adult carriers and newsboys. These substitute facilities did not involve the creation of an employment relationship between the plaintiff and the carriers and newsboys, but plaintiff's papers were sold to such persons upon the same terms as had always prevailed between the plaintiff and its other newsboys on the one hand and the Dealers on the other.

The number of plaintiff's newspapers affected by the refusal of the Dealers to handle them was approximately 15,000 per day and a slightly smaller number on Sundays. This "refusal to handle" on the part of the Dealers continued for a period of approximately two weeks and was participated in by sixteen of the individual defendants. Just prior to the commencement of this period of refusal to purchase plaintiff's papers, each of the Dealers delivered to the customers to whom he had previously delivered plaintiff's paper written notices accusing plaintiff of "unethical practices" and advising the customer that in consequence thereof the Dealer would "be unable to deliver" plaintiff's newspaper temporarily. The Dealer suggested in such notice that if the customer wished to substitute another paper, he notify the Dealer. Another form of notice given by certain of the Dealers and delivered to customers accused the plaintiff of adopting a policy to eliminate newsdealers and confectionery stores from the newspaper

business for the purpose of controlling circulation and enabling the plaintiff to dictate "every phase of the business." The notice warned that the plaintiff's efforts would be accomplished by "tempting children with the grand idea that they would be 'little merchants' who own their business (paper routes)." Further in the course of the text of certain of such notices, and for the purpose of persuading their customers to a view favorable to the dealers, it was rhetorically asked:

"Do you suppose a mother would permit her child to go out on a cold nasty day, or in the rain to deliver newspapers * * * or would she compel him to deliver his route if the child was ill? She just couldn't * * * but we must."

Notices given by other Dealers to their customers in anticipation of this interruption of service charged that the plaintiff was insisting that the Dealer deliver the paper at such a low rate that it would be impossible for the Dealer to earn a living. Another form of notice employed by one or more of these Dealers was captioned "Newsdealer v. Newark News" and set forth the disadvantages under which the Dealers were compelled to handle plaintiff's paper, with the statement that plaintiff sought "men's services at boy's wages."

Upon the expiration of the initial two weeks during which the Dealers refused to handle the plaintiff's papers, the Dealers resumed acceptance and delivery of the papers, but sought to persuade plaintiff to induce the newsboys to abandon their routes in the Dealers' areas which the boys had been covering during the period of their refusal to handle. The resumed business relations between the parties continued until January, 1957, when a meeting was arranged between Mr. Hutchings and some of the Dealers with persons in charge of plaintiff's Circulation Department, at which the demand that the plaintiff force the newsboys out of the Dealers' areas was renewed. Plaintiff's representatives again refused to yield to this demand and Mr.

Hutchings, as spokesman for the Dealers, renewed the threat to "strike". Thus was the present litigation precipitated.

On August 23, 1956, following the termination of the initial refusal to handle plaintiff's papers, the Dealers formed Allied, and when Mr. Hutchings renewed the "strike" threat in January, 1957, he informed plaintiff's representatives that Allied then had from 40 to 45 members. On May 20, 1957, the date initially designated for the commencement of the trial of this case, Allied had grown to a membership of 133 Dealers. In its Certificate of Incorporation the purpose for which Allied was formed is stated as follows:

"To join in the single purpose of providing unity amongst the various newspaper carriers of the entire State of New Jersey to the end that proper and fair and honorable trade practices be maintained and kept; to act as a single unit or body in determining fair pricing and means and methods of delivery of newspapers with the various publishers and distributors of these papers; to act in common concert for the individual financial betterment of each of its members but in no wise to make any profit from such individual newspaper carriers; to meet unfair competition as a single body by the employment of all lawful means; to create and maintain by-laws; to hold meetings at regular designated times by Executive Committee or as a whole and to do all things that are proper, just and legal to the end that the individual businesses of the members named above and those others that may join subsequently shall not be crushed by unfair competition or by any other means by competition or by newspaper publishers or by any other agency."

Between May 20, 1957, the date initially designated for the commencement of the trial of this case, and June 18, 1957, when the interlocutory injunction was granted therein, the membership of Allied renewed the "boycott" of plaintiff's

paper, which only terminated in obedience to the interlocutory injunction. During this period, the Dealers' refused to handle approximately 32,000 daily and Sunday copies of plaintiff's newspaper, but plaintiff admits, on this argument, that approximately 16,000 of its newspapers were received by its readers as a result of plaintiff's best efforts in utilizing substitute service then available.

### The Complaint.

■ Before discussing the merits of the case, it is necessary to deal with a question of the sufficiency of the complaint, only now raised by the defendants. It may be dealt with quickly. I view the complaint as sufficient under Rule 12(h). Further, not only have the issues been tried out, but there is ample evidence in the record which requires a decision on the merits. Therefore, the present "motion" is not well taken. Black, Sivalls, & Bryson v. Shondell, 8 Cir., 1949, 174 F.2d 587; Hon. Leon A. Yankwich, Federal Trial Practice in Civil Cases, 12 F.R.D. 269, 278. Cf. Grammas v. Colasurdo, App.Div.1958, 48 N.J.Super. 543, 138 A.2d 553.

### The Restraint of Trade.

■ As hereinabove pointed out, the plaintiff charges that the acts of the defendants of which it complains were violative of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2).[1]

In deciding whether there has been a violation of Section 1 of the Sherman Act, three principal questions are posed:

(1) Is there a sufficiency of proof that a "contract, combination in the form of trust or otherwise, or conspiracy" exists?

(2) Is there a market in which the effect of the challenged arrangement may be tested, and by what evidence is the market defined?

(3) Does the conduct of the defendants in that market unduly restrain competition and does it "restrain trade or commerce among the several states"?

The concession of the defendants that they combined in their refusal to purchase and distribute plaintiff's newspaper, which is eminently appropriate in the light of the overwhelming proof, answers the first of the foregoing questions in the affirmative. That its purpose was the elimination of price competition presented by independent newsboys who operated in territories which the Dealers had arrogated to or obtained for themselves for the conduct of their business of delivering newspapers to the homes and places of business of the newspaper readers is also apparent in the evidence and conceded by the defendants.

■ We now seek to determine in what market the legality of the challenged combination is to be tested, and by what evidence such market is defined. There is to be discerned, from the evidence in this case, a distinctly definable market within which the competition between the newsboys and the Dealers operates, and in which they are the principal contenders. For want of a better designation, I shall employ the phrase "home delivery market" to denote the field of their contest. Defendants correctly point out that the distribution of plaintiff's newspaper is not confined to the Dealers or to the newsboys. Although some of the newspaper's circulation is by mail on direct subscription by a reader or by sales to stores and newsstands, for resale to members of the reading public, the evidence discloses that there is a substantial category of readers of the plaintiff's newspaper who prefer to have the newspaper delivered to their homes or offices. In this group of readers

---

1. "§ 1. Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

"§ 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

are contained the customers of the Dealers and of the newsboys. To a reader who failed to receive his newspaper when his Dealer refused to purchase the paper from the plaintiff were still available the alternatives of arranging for delivery thereof by a newsboy, or directly by the plaintiff, or by purchasing the paper at a newsstand or a store. Thus, the restraint resulting from the combined refusal to handle in this case was not effective throughout the *general* market for plaintiff's newspaper, but was limited to the home delivery market in which it operated to restrain the flow through the home delivery outlet of the commerce involved in the production and distribution of the newspaper. In this limited market the restraint made itself felt to a substantial degree, and was enhanced by the written notices which the Dealers circulated among their customers in the Dealers' efforts to justify their position and to strengthen the boycott by inviting and encouraging antagonism toward the plaintiff by using the sympathy of the newspaper reader for the Dealer.

■ Defendants argue that "the only competition which defendants have sought to eliminate is the competition of plaintiff-subsidized newsdealers, employed on plaintiff-owned routes to force the independent home delivery dealers to adhere to the prices dictated by plaintiff." I find no support in the evidence for the foregoing assertion. Rather, I find an ample basis for its negation. Plaintiff sold its newspapers to all wholesale purchasers at the same price. While plaintiff's authorized representatives emphatically refused to comply with the defendants' demand for the elimination of newsboy distributors, I find no proof that in selling its papers to newboys the plaintiff was attempting to force the Dealers to adhere to prices charged by the newsboys. Although there is some evidence to the effect that in direct campaigns to increase circulation the plaintiff had advertised a price similar to that charged by the newsboys, that evidence does not suffice to support the price-fixing charge against the plaintiff. Indeed, there is evidence that the new customers which the plaintiff secured by such direct solicitations were offered to the Dealers, who were at liberty to either accept them at the price stated, or to reject them. In case of a Dealer's unwillingness to accept such a new customer at the advertised price, a newsboy would be made available to serve that customer.

■ The Dealers further assert that they do not complain of competition from distribution means other than the newsboys, such as newsstands, candy stores, street sellers, plaintiff's mail circulation, or independent home delivery dealers not associated with Allied. They say that their dispute is only with the plaintiff, and relates only to what they characterize as plaintiff's unfair business methods. While the dispute is with the plaintiff, its object is to force the plaintiff to eliminate the newsboys and thereby remove the competition which the newsboys create. I find in the evidence no proof of any of the unfair business methods of which the Dealers accuse the plaintiff. Combination boycotts, like other group action to coerce, have long been condemned as unreasonable restraints under § 1 of the Sherman Act. Fashion Originators' Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; Eastern States Retail Lumber Dealers' Association v. United States, 1914, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490.

■ Next, we approach the question of whether the conduct of the defendants affects interstate commerce. From the foregoing background of factual items, certain sharp outlines emerge presenting a situation summarizable within a narrow compass. In the publication of its paper the plaintiff is engaged in interstate commerce. Its activities include the procurement of newsprint from outside the State and even from beyond the seas. The ultimate distribution of its printed product extends not only throughout the State of New Jersey, in which its plant is located, but throughout many States of the Union. It gleans news throughout the nation and the

world and transmits it to its readers throughout the broad territory mentioned. The great breadth of its circulation attracts profitable advertising not only from within the State of New Jersey but from numerous persons and concerns in other States. This advertising, together with the news, reaches the newspaper's readers by means of a variety of forms of physical transportation whereby the newspaper is carried interstate and internationally. The flow of such commerce is both toward and from the plaintiff and terminates ultimately in the receipt of the newspaper, with its news and advertising content, by the reader. Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277; Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162; Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; Kansas City Star Co. v. United States, 8 Cir., 1957, 240 F.2d 643, certiorari denied 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438. The recognized fact that a portion of such flow moves from the publisher to readers within the same State in which the newspaper is published does not remove that portion from the totality of the interstate current in which the plaintiff, the Dealers, and the newspaper readers are equally involved. The interstate commerce stream has more than one branch. After it leaves the printing press, the newspaper may be sold and delivered to stationery, candy or similar stores, or newsstands, at which it may be purchased by readers; or it may be sold by plaintiff directly to newsboys who, in turn, sell and deliver it to the readers; or the Dealers may purchase the paper from the plaintiff and sell and deliver it to their customers. These three courses, among others, by which the newspaper reaches the ultimate consumer are like the several outlets of a river near its mouth. Each branch of the multiple outlet is still a channel of interstate commerce. It is perfectly obvious from the concessions of the defendants, as well as from the testimony in this case, that the dominant object of the combined refusal to handle plaintiff's newspaper was the elimination of newsboy competition in the distribution of plaintiff's paper to the homes and places of business of its readers within the areas of the Dealers' actual or contemplated operations. To the extent that the Dealers approached the achievement of that objective, the impact of their restraint increased and their advantage in the relevant market was enlarged. As was said in United States v. Columbia Steel Co., 1948, 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533:

> " * * * [T]he amount of interstate trade affected is immaterial in determining whether a violation of the Sherman Act * * * [exists]. A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal *per se*."

Since this case was submitted to the Court, counsel for defendants have drawn the Court's attention, by letter, to the yet unreported opinion of Judge Sullivan of the Chancery Division of the Superior Court of New Jersey in Durling Farms v. Tri-State Guild. I have read that opinion with the benefit of the expressions, by letter, of the views with respect thereto of both counsel in the case at bar. This Court does not consider the decision pertinent to the issues here presented. The concerted refusal to handle obviously restrains interstate commerce, and I conclude from the evidence that the restraint is undue and substantial.

### The Monopoly.

Does the evidence clearly disclose a violation of § 2 of the Sherman Act? The language of § 2 prohibits three types of conduct, viz.: (1) monopolization; (2) attempts to monopolize; and (3) combinations or conspiracies to monopolize.

In American Tobacco Co. v. United States, 1946, 328 U.S. 781, at pages 809–810, 66 S.Ct. 1125, at page 1138, 90 L.Ed. 1575, Mr. Justice Burton, speaking for the Court, said:

"A correct interpretation of the statute and of the authorities makes it the crime of monopolizing, under § 2 of the Sherman Act, for parties, as in these cases, to combine or conspire to acquire or maintain the power to exclude competitors from any part of * * * trade or commerce * * *, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, 60 S.Ct. 811, 846, 84 L.Ed. 1129 [note 59] and authorities cited.

"It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. * * * The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words."

Alleged violations of both §§ 1 and 2 of the Sherman Act were involved in Times-Picayune, supra. In that case it is stated that although group boycotts or concerted refusals to deal clearly run afoul of § 1 of the Act, there must be disclosed by the evidence a specific intent to achieve monopoly by the combination in order to constitute a violation of § 2. The Court then concluded, 345 U.S. at page 626, 73 S.Ct. at page 890, that the case before it did

" * * * [N]ot demonstrate an attempt by a monopolist established in one area to nose into a second market, so that past monopolistic success both enhances the probabil-ity of future harm and supplies a motivation for future forays."

 In the case before us there was a boycott and it was illegal. By means of it an undue restraint was imposed upon interstate commerce. Upon these premises plaintiff contends that a violation of § 2 of the Act necessarily appears. I do not reach that conclusion. The conceded boycott and its consequent undue restraint upon interstate commerce has not been shown to have resulted in the creation of a monopoly of the Dealers in the newspaper distribution business, nor to have been undertaken or persisted in with the intent that they should monopolize such distribution. Even within the limited market of home delivery, the restraining combination does not trend in the direction of ultimate monopoly. There is no proof that any uniform price is charged by the Dealers for home delivery of plaintiff's newspaper or that Allied is being employed as a price-fixing instrumentality. Further, the Dealers do not jointly occupy and control a single delivery territory. The evidence discloses no likelihood that success in excluding newsboys from the territory of any Dealer would enable him to monopolize the distribution of the newspaper in that territory. There is a limit to the price which a reader will be willing to pay for home delivery of his newspaper. Beyond that limit numerous other sources are available to him for the procurement of his newspaper at a lower price. The criteria for monopoly stated in United States v. E. I. DuPont & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, and in American Tobacco Co. v. United States, supra, are not here disclosed in the evidence. The evidence fails to sustain the charged violations of § 2 of the Sherman Act. United States v. DuPont & Co., supra.

By reason of the clear violation of § 1 of the Sherman Act, to be found in the actions and threats of the Dealers, in combination through Allied, and among themselves, plaintiff is entitled to permanent injunctive relief from such conduct on their part in the future.

The interlocutory injunction filed herein on June 18, 1957 will be made permanent in accordance with the views herein expressed. The form of the decree may be settled on notice.