**EVENING NEWS PUBLISHING COM-
PANY, a Corporation, Plaintiff-
Appellee,**

v.

**ALLIED NEWSPAPER CARRIERS OF
NEW JERSEY, a Corporation, et al.,
Defendants-Appellants.**

**No. 12647.**

United States Court of Appeals
Third Circuit.

Argued Nov. 20, 1958.

Decided Feb. 20, 1959.

Jerome C. Eisenberg, Newark, N. J.
(Eisenberg & Spicer, Newark, N. J.,
Ralph Neibart, Newark, N. J., on the
brief), for defendants-appellants.

Edward J. Gilhooly, Newark, N. J.
(Gilhooly, Yauch & Fagan, Newark, N.
J., Riker, Emery & Danzig, Charles Dan-
zig, Newark, N. J., on the brief), for
plaintiff-appellee.

Before BIGGS, Chief Judge, and
MARIS and McLAUGHLIN, Circuit
Judges.

McLAUGHLIN, Circuit Judge.

This anti-trust litigation arises from
defendants' efforts to force plaintiff to
eliminate newsboy home delivery of plain-

tiff's newspapers, The Newark, New Jersey Evening and Sunday News.

The defendants consist of 19 home delivery dealers and a New Jersey non-profit corporation, Allied Newspaper Carriers of New Jersey, formed by the individual defendants in August, 1956. The corporation acted as bargaining agent for its members. By June, 1957 its membership had increased to 133 home delivery dealers.

The facts found by the district court were mostly conceded, though there seems some misunderstanding as to this by appellants' present counsel. In any event there is substantial support in the record for the court's fact findings which are set out in great detail in the opinion below. D.C.1958, 160 F.Supp. 568. Only those necessary for present purposes will be noted.

Allied on February 15, 1956, was an unincorporated association of Home Delivery Dealers of which James L. Hutchings was president. On that date he, with 17 other members, complained to the News Circulation Director about late deliveries of the paper to the dealers. They threatened to discontinue handling the News unless this was remedied. Plaintiff agreed to improve its service. After that and prior to July 13, 1956, Hutchings demanded of the Circulation Director that all newsboys delivering the News in any territory of the Dealers should be forced out of business by plaintiff refusing to sell its newspapers to them. Plaintiff refused and was again threatened by the Dealers' spokesman with a refusal to handle the News by the Dealers. Within the same period, the Dealer representatives demanded that plaintiff "shut out" any distributor other than the newspaper man or Dealer in the particular area allocated to him by the Dealers themselves. On July 13, 1956, Hutchings and an attorney, who later represented the defendants at the trial, gave the News Circulation Director the ultimatum that unless plaintiff discontinued the use of newsboys in the distribution of its newspaper, the Dealers would no longer handle it. This was refused and that same day the Dealers refused to accept copies of the News from plaintiff. The latter tried to fill the gap with substitute carriers, selling its papers to them on the same terms as had existed between plaintiff and its other newsboys and the Dealers.

The number of newspapers affected daily was about 15,000; on Sunday the amount was somewhat less. The Dealers' action continued for about two weeks with 16 of the individual defendants participating. Just prior to its start, the Dealers gave written notices to their customers accusing the News of unethical practices, explaining that they would be unable to deliver the paper temporarily and suggesting that the Dealer be notified if the customer wished to substitute another paper. Certain of the Dealers gave their customers a notice which accused the News of trying to eliminate them and confectionary stores from the newspaper business and thus control circulation, etc. This notice warned that plaintiff would tempt little children into becoming newsboys by giving them the idea they would become little merchants handling their own routes. Some of the notices conveyed the idea that children acting as newsboys were forced to make their deliveries in bad weather and when they were ill. Other notices charged that the low rates insisted on by the News made it impossible for the Dealer to earn a living. Another form of notice said plaintiff sought men's services at boys' wages.

At the expiration of the two weeks the Dealers resumed taking and distributing the News but sought to persuade plaintiff to induce the substitute newsboys in the Dealers areas to withdraw. Business relations continued between the Dealers and the News until January, 1957, when at a meeting between Hutchings with some other Dealers and News Circulation Department personnel, demand was made that the substitute boys be eliminated. This was refused and Hutchings for the Dealers renewed the strike threat. As a result plaintiff brought this suit charging violations of Sections

1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2) and seeking interlocutory and permanent injunctive relief.

An answer was filed admitting the jurisdiction of the court and all of the allegations of the complaint regarding the intrastate and interstate elements of plaintiff's business. It denied plaintiff was entitled to relief and alleged various affirmative defenses.

On or about May 20, 1957, the date originally fixed for trial of this matter, the Allied members renewed their boycott of the News. This was stopped on June 18, 1957, solely by the interlocutory injunction. During the boycott period, the Dealers refused to handle approximately 32,000 daily and Sunday copies of the papers. By expensive substitute service, the News succeeded in having approximately 16,000 papers delivered to the readers affected.

The trial of the suit started May 23, 1957 and continued intermittently until June 17, 1957. On June 18, 1957 an interlocutory injunction was allowed plaintiff. Prior to final decision the district judge who heard the matter, died and the case was reassigned. Thereafter briefs were filed and oral argument had. At that time counsel for the defendants adopted the factual summary set out in plaintiff's main brief and withdrew the affirmative defenses of the answer. He, for the defense, continued to assert that no relief was justified under the circumstances and questioned the sufficiency of the complaint. It was conceded on behalf of the defendants that their actions complained of resulted from an agreement and combination of the individual defendants through their membership in the corporate defendant.

The district court held that there had been a restraint of trade in violation of Section 1 of the Sherman Act but that the evidence failed to sustain the charged violations of Section 2 as to monopolizing. The injunction was made permanent and the final decree was entered April 9, 1958.

Appellants on this appeal assert that the proofs fail to show a conspiracy to restrain interstate commerce. They stress that such was not their intention; they make no attempt to divide plaintiff's business into intrastate and interstate but seek to emphasize that it was not shown that any Allied member delivers outside of New Jersey; they would excuse their action as protection against discriminatory practices and unfair competition, saying that "The 'restraint' was not intended to achieve a restraint upon interstate commerce."

The truncated argument advanced would have us forget completely that interstate commerce is an inseparable, indispensable part of this plaintiff newspaper. The News does furnish neighborhood, city, county and state news to its readers. And by far the major portion of its sales are in New Jersey. But an essential element of its being, (perhaps considering its territory and the present state of this world of ours its most essential element) is the obtaining, dissemination and interpretation of national and world-wide news. Intrastate advertising is necessary to the economic life of the paper and necessary to its readers. Interstate advertising affects the paper and its readers to a lesser degree but affect them it does appreciably. To place that news and advertising in the hands of New Jersey people requires, as the United States Supreme Court said in Lorain Journal v. United States, 1951, 342 U.S. 143, 151, 72 S.Ct. 181, 185, 96 L.Ed. 162, " * * * continuous interstate transmission of materials and payments to say nothing of the interstate commerce involved in the sale and delivery of product sold". The end result, the distribution of the News, as a complete newspaper containing those news items and advertisements, to its reading public in Newark or any other New Jersey area is, as the Court held in Lorain (342 U.S. at page 152, 72 S.Ct. at page 185), " * * * an inseparable part of the flow of the interstate commerce involved." That Court said further (342 U.S. at page 152, 72 S.Ct. at page 186), "Without the protection of competition at the *outlets* of the flow of

interstate commerce, the protection of its earlier stages is of little worth." (Emphasis supplied). It should be noted that in Lorain, as here, the contention was that merely a local issue was in dispute. See also Greenspun v. McCarran, D.C. Nev.1952, 105 F.Supp. 662; Hearst Publications v. N. L. R. B., 9 Cir., 1943, 136 F.2d 608, 610, reversed on other grounds N. L. R. B. v. Hearst Publications, 1944, 322 U.S. 11, 64 S.Ct. 851, 88 L.Ed. 1170. See generally Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 602–603, 604–605, 610, 73 S.Ct. 872, 97 L.Ed. 1277.

■ Whatever may have been its purpose, plainly the restraint imposed by defendants did affect interstate commerce. But, suggest the appellants, plaintiff must go further than that, it must prove that the activities of the defendants directly affected interstate commerce and that there has been undue restriction thereon harmful to the general public. Again they stress what they call "the purely local activities of these defendants".[1]

The district court concluded from the evidence that the restraint on interstate commerce was undue and substantial. Our examination reveals that the record supports these findings. The Lorain opinion governs the situation before us. United States v. Yellow Cab Co., 1947, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010, is hardly in point but, as far as it goes, supports the proposition that the home delivery of the News is an integral part of the interstate operation. The other two early decisions relied on do not represent what we think is the present law.[2]

Finally, appellants assert that their concerted refusal to accept the News for home delivery did not restrain competition. They "maintain" their concession

that their actions and refusal to deal with plaintiff which resulted from an agreement among themselves went no further than to relieve plaintiff of the burden of showing that a "combination" existed; that it did not relieve plaintiff of proving that the combination was one which unreasonably restrained competition.

The Supreme Court in Northern Pacific R. Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545, left no doubt what the true rule is in a group boycott case like the one before us. Mr. Justice Black for the Court said in 356 U.S. at page 5, 78 S.Ct. at page 518:

"However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129; division of markets, United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, affirmed

1. They urge, as they did below, that it is the plaintiff who is really fixing the prices of the home delivery of its papers. The district judge found no support in the evidence for that assertion; to the contrary ample basis for its negation. The record entitled him to those conclusions and we have no right to disturb them.

2. Anderson v. United States, 1898, 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300; Hopkins v. United States, 1898, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290.

175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; *group boycotts,* Fashion Originators' Guild v. Federal Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20." (Emphasis supplied).

The Northern Pacific litigation dealt with tying arrangements, one of the same category as group boycotts. Mr. Justice Black, speaking of these said in 356 U.S. at page 6, 78 S.Ct. at page 518:

"Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' Standard Oil Co. of California v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons 'tying agreements fare harshly under the laws forbidding restraints of trade.' Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 606, 73 S.Ct. 872, 879, 97 L.Ed. 1277. *They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected.*" (Emphasis supplied.)

There was no incredibly complicated and prolonged economic investigation in this suit such as the Supreme Court, in Northern Pacific, holds unnecessary in a group boycott. Nevertheless the dis-

trict court did sit for at least eleven days hearing testimony and argument. From the record it was held that the evidence established that the restraint resulting from the Dealers refusal to handle deliveries of the News for the home delivery market had made itself felt to a substantial degree. This was based on the uncontradicted testimony that the 1956 boycott had stopped the home delivery of about 15,000 daily papers and a somewhat lesser number on Sunday; that the restraint was enhanced by the written notices the Dealers circulated among their customers; that the 1957 boycott had prevented delivery of some 32,000 papers, daily and Sunday; that the plaintiff's extraordinary costly effort to keep its home delivery readers supplied in the latter crisis only took care of about half of those cut off by the strike.

Appellee claims that the 1957 boycott affected 20% of the total circulation of the News. This is disputed by the Dealers, as complicated mathematics. Even if the percentage figure were to be considerably reduced the number of papers eliminated by the boycotts is before us. These constituted "an appreciable amount of commerce under any standard". United States v. Yellow Cab, 1947, 332 U.S. 218, 225–226, 67 S.Ct. 1560, 1564.

It seems to us therefore from the record, that it was solidly established in the course of the trial that the boycotts had appreciably restrained free competition in the home delivery of the newspapers involved and that a not insubstantial amount of interstate commerce was affected. The evidence also unquestionably demonstrates the effort of the defendants to acquire a monopoly of plaintiff's home delivery business, though we agree with the district court that it fails to establish that defendants possessed the power to actually accomplish this particular objective. Appellee strongly contends that the presence of intent to suppress competition removes the obligation of proving that a substantial amount of interstate commerce is affected. Because, as we have already

stated, the record firmly supports the Supreme Court test as laid down in Northern Pacific, there is no need for us to pass upon that question at this time.

The judgment of the district court will be affirmed.