**OTTO MILK COMPANY, Plaintiff**

v.

**UNITED DAIRY FARMERS COOPERATIVE ASSOCIATION, United Dairy Farmers, Ernest Hayes, J. D. Smouse, Joseph M. Piper, Stanley Yagla and Adam Babiarz, Defendants.**

Civ. No. 66–705.

United States District Court
W. D. Pennsylvania.

Nov. 10, 1966.

Walter T. McGough, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Paul A. Simmons, Monongahela, Pa., John W. McIlvaine, Washington, Pa., for defendants.

JOHN L. MILLER, District Judge.

## OPINION

Plaintiff, Otto Milk Company (Otto), filed a complaint alleging violations of Sections 1 and 2 of the Sherman Anti-trust Act, 15 U.S.C. §§ 1 and 2,[1] by de-

---

1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *" (§ 1)

"Every person who shall monopolize, or attempt to monopolize, or combine or con-spire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *." (§ 2)

fendants and asking that defendants be enjoined from further violations of said Act and that plaintiff be paid treble damages because of such violations. Testimony was taken and oral argument held by the Court. At the oral argument, plaintiff waived its claim for damages and the Court now has before it only plaintiff's petition for an injunction.

Plaintiff, a Pennsylvania corporation with its principal office and plant in Pittsburgh, is engaged in the purchasing of raw milk which it processes and bottles, and in the manufacture of general dairy products, including bottled milk, which it sells to numerous retail stores in Pennsylvania, Ohio and West Virginia. While the raw milk purchased by plaintiff is produced on farms in Western Pennsylvania, it purchases materials for milk containers, dairy products containers, milk cases and ingredients for its processed dairy products from other states, spending more than one million dollars annually for such out-of-state purchases.

The defendants are United Dairy Farmers Cooperative Association, an incorporated association whose members operate dairy farms in Pennsylvania; United Dairy Farmers, an unincorporated association of dairy farm operators; and Ernest Hayes, J. D. Smouse, Joseph M. Piper, Stanley Yagla and Adam Babiarz, all of whom are officers of the United Dairy Farmers Cooperative Association (Association) and the United Dairy Farmers (UDF).

The complaint alleges that defendants conspired among themselves and with others to boycott and to induce others to boycott the products of plaintiff, to raise, fix and affect the price of raw milk and to eliminate competition between the Association and UDF and their competitor, Dairymen's Cooperative Sales Association (DCSA), the milk marketing organization through which Otto purchases raw milk. It is also alleged that defendants have conspired and attempted to monopolize the sale of raw milk in Western Pennsylvania, and that defendants' conduct constituted an intentional interference with long-standing business relationships between Otto and its customers.

There is ample evidence in the record to establish that on or about May 26, 1966, members of the defendants, Association and UDF, began marching in front of retail stores which sell Otto products in various communities in Armstrong, Butler, Fayette, Washington and Westmoreland Counties. They were carrying signs bearing various statements, such as "Otto Milk refuses to pay farmers fair prices for milk," "Otto Milk Company refuses to pay fair prices to farmers," and "Otto Milk is unfair to the farmer."[2] These members of defendant organizations told the managers of the stores in front of which they marched that they would leave if the store stopped selling Otto's products. In some instances they also asked the store managers to substitute Beverly Farms' products for Otto's. When store managers acquiesced by discontinuing purchases of Otto's products, the pickets were removed. While picketing in front of these stores, defendant organizations' members also distributed handbills signed by United Dairy Farmers Cooperative Association and urging the consumers to purchase Beverly Farms milk.

We are satisfied from the evidence that these pickets have been associated with and their activities authorized by defendants. The signs used by them either referred to the UDF or were similar to a sign exhibited in Court which bore the name of the UDF. Furthermore, several of the pickets identified themselves as members of UDF or were found to be connected with members of UDF.

Defendants contend that this Court lacks jurisdiction of this action under the Sherman Antitrust Act because their alleged actions are purely intrastate activities. The Sherman Act, however, is not to be construed so nar-

---

2. It is undisputed that Otto paid milk producers the price required by the Pennsylvania Milk Control Commission.

rowly. It "extends not only to transactions in the stream of interstate commerce, but also to intrastate transactions which substantially *affect* interstate commerce." Las Vegas Merchant Plumbers Association v. United States, 210 F.2d 732, 739 (9 Cir. 1954). The source and application of the restraint upon trade may be intrastate, as defendants' activities are here, but that does not matter if it is interstate commerce that is affected. As Justice Jackson stated in United States v. Women's Sportswear Manufacturers Association, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949), "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

▮ We believe that plaintiff has demonstrated that defendants' activities would have an effect on interstate commerce. We need not be concerned with the exact dollars and cents effect, so long as the volume of trade involved is "not insubstantial." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey, 263 F.2d 715 (3 Cir. 1959), cert. den. 360 U.S. 929, 79 S.Ct. 1449, 3 L.Ed. 1544 (1959). Defendants' activities resulted in a loss of business to plaintiff amounting to approximately $3,600.00 per week. Otto sells products in states other than Pennsylvania, the volume of these sales at times exceeding $200,000.00 annually. Otto also purchases from other states materials which it uses in its business. The

volume of these purchases is well over one million dollars per year. It is obvious that a decline in Otto's business would have an effect on interstate commerce that is "not insubstantial."

▮ Defendants also contend that they are exempted from the provisions of the Sherman Antitrust Act by virtue of Section 6 of the Clayton Act, 15 U.S.C. § 17[3] and the Capper-Volstead Act, 7 U.S.C. § 291.[4] The Clayton Act, however, extends its exemption to agricultural organizations only for the purpose of "lawfully carrying out the legitimate objects thereof," and the Capper-Volstead Act permits dairymen to act in associations in "collectively processing, preparing for market, handling and marketing in interstate and foreign commerce" their products.

It was the purpose of Congress in passing these Acts to provide that farmers or dairymen might act together in cooperative associations without the associations as such being construed to be illegal combinations or conspiracies in restraint of trade as they otherwise might have been. Maryland and Virginia Milk Producers Association v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); North Texas Producers Association v. Metzger Dairies, Inc., 348 F.2d 189 (5 Cir. 1965). It was never intended, however, that agricultural cooperatives be given a blanket exemption from the antitrust laws that would allow them to engage in predatory practices or conspire with others to monopolize or otherwise restrain trade in violation of the anti-

---

3. "* * * Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

4. "Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: * * *."

trust laws. Maryland and Virginia Milk Producers Association v. United States, supra; North Texas Producers Association v. Metzger Dairies, Inc., supra.

Defendants, by picketing retail grocery dealers and by asking them to remove Otto's products from their stores and to substitute Beverly Farms' products therefor, have engaged in an operation amounting to a boycott of Otto and DCSA. These activities were designed ultimately to exclude DCSA from competition in the milk market in this area and to corner that market for the Association and UDF. The Supreme Court has declared such group boycotts to be unlawful in and of themselves. Northern Pacific Railway Co. v. United States, supra; Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey, supra; Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

This attempt to monopolize local business by restraining interstate commerce through the means of a boycott is a direct violation of Section 2 of the Sherman Act. Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). When one suppresses competition, he necessarily restrains trade. Wm. Goldman Theatres v. Lowes, Inc., 150 F.2d 738 (3 Cir. 1945). The fact that a monopolization of the market has not yet been achieved does not excuse defendants' conduct. It is sufficient that there is a tendency toward monopoly or that there is a reasonable likelihood of a substantial lessening of competition. United States v. Penn-Olin Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). It is practices which tend to create a monopoly which are forbidden; the law need not await the accomplishment of the objective. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). If allowed to continue and if successful, defendants could eventually exclude DCSA from the milk market in southwestern Pennsylvania.

Likewise defendants' activities constitute a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act. There was, in effect, a conspiracy between defendants and the owners of the retail stores which they picketed to boycott Otto and thus restrain competition between UDF and DCSA. The fact that the agreement of the storekeepers was obtained by coercion does not detract from the existence of a conspiracy. Simultaneous or express agreement between parties is not necessary to the formation of a conspiracy. Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). It is sufficient if there is acquiescence in an illegal scheme. United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Indeed, even if one is coerced by economic threats or pressure to participate in an illegal scheme, that does not make him any less a co-conspirator. Flintkote Co. v. Lysfjord, 246 F.2d 368 (9 Cir. 1957).

The case at bar is quite similar to the case of Giboney v. Empire Storage Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949). In that case the Supreme Court upheld a state court judgment enjoining officers and members of a union of ice peddlers from picketing an ice company's place of business because it found that the sole purpose of the picketing was to induce the ice company to agree not to sell ice to non-union peddlers. Here the sole purpose of defendants' picketing has been to induce or force certain retail store operators to agree not to purchase dairy products from Otto because Otto buys milk through DCSA rather than UDF. Just as the picketing in the *Giboney* case was a violation of the state anti-trade-restraint law, the picketing here is a violation of the Sherman Antitrust Act.

The case at bar is also similar to the case of Milk Producers Association v. United States, supra, wherein the Su-

preme Court held that an agricultural marketing association composed of dairy farmers had violated the Sherman Anti-trust Act in attempting to get dealers to purchase milk from the association. The dairymen employed a boycott and exerted other economic pressure on dealers to attain their goal. This activity the Court held to be outside the legitimate objects of a cooperative and to constitute a violation of the Sherman Act.

As a violation of that Act, it matters not that the means employed were those of peaceful persuasion. Paramount Pictures v. United Motion Picture Theatre Owners, 93 F.2d 714 (3 Cir. 1937). Merely because defendants' picketing involved the use of speech or was viewed by them as "telling their story" to the public, their activities are not necessarily entitled to the protection of the First Amendment. Picketing is more than speech; it is speech mixed with particular conduct. Building Service, etc., Union, Local 262 v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045 (1950); Cox v. State of Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). A picket line has potential for inducing action beyond the message the pickets convey. The very purpose of picketing is to exert influences and produce results different from the usual means of communication. Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950).

Indeed, the purpose of the picketing here was to induce the retail store operators to agree to stop handling Otto's products and in many instances it was successful. The pickets wanted not only to tell their story to the public, they wanted also to stop the customers from shopping at the stores and in turn stop the stores from dealing with Otto. To put it another way, the objective of the picketing was to achieve a result contrary to the provisions of the Sherman Act. The Supreme Court has made it clear that picketing employed as an integral part of conduct in violation of a valid statute is not entitled to the immunity granted other forms of expression. Giboney v. Empire Storage Co., supra. The enjoining of picketing, the sole purpose of which is in conflict with a valid statute, is not inconsistent with Constitutional guarantees of freedom of speech. Local Union No. 10, United Association of Journeymen Plumbers, etc., Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946 (1953); International Brotherhood of Teamsters, etc. v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957).

Plaintiff has satisfactorily established that defendants were engaged in activities which constitute a boycott designed to restrain and monopolize interstate commerce in violation of the Sherman Anti-trust law. For this reason, plaintiff's prayer for a permanent injunction of these activities by defendants must be granted. Therefore, counsel for plaintiff is directed to file suggested findings of fact and conclusions of law and a form of decree in accordance with this Opinion.