**Bonnie C. WEBB, Bob W. Robbins, Melissa A. Tant and Benito Cavaliere, Plaintiffs,**

v.

**ATHENS NEWSPAPERS, INC., Defendant.**

**No. Civ.A. 3:96–cv–50(HL).**

United States District Court, M.D. Georgia, Athens Division.

March 30, 1998.

---

Janet Elizabeth Hill, Sujata G. Winfield, Athens, GA, for Bonnie C. Webb, Plaintiffs.

Donald B. Harden, Allison Elmore Thornton, Atlanta, GA, for Defendant.

## ORDER

LAWSON, District Judge.

### I. Procedural History

Plaintiffs filed suit on March 28, 1996, seeking to recover overtime and minimum wage compensation under the Fair Labor Standards Act of 1938. Defendant answered on August 15, 1996. Now before the Court is Defendant's Motion for Summary Judgment, which claims that certain sections of the Act exempt Plaintiffs from coverage. For the reasons set forth below, the motion is granted in part and denied in part.

### II. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgement may be entered in favor of the movant where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." At summary judgement, the initial burden is on the movant, who must show by reference to materials on file "that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). If the burden of proof at trial is on the movant, the moving party must present evidence to show that "on all the essential elements of its case ..., no reasonable jury could find for the non-moving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc). If it is the non-movant who has the burden of proof at trial, then the movant may meet its burden either by presenting evidence to negate an essential element of the non-movant's claim, or by demonstrating by reference to specific portions of the record that the non-moving party cannot meet its burden of proof. *See Clark*, 929 F.2d at 606–08.

Whether the movant or the non-movant has the burden of proof at trial, the Court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Any evidence presented by the movant must be viewed in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

While the evidence and all factual inferences therefrom must be viewed by the Court in the light most favorable to the party opposing the motion, that party cannot rest on its pleadings to present an issue of fact but must make a response to the motion by filing affidavits, depositions, or otherwise in order to persuade the Court that there are material facts present in the case that must be presented to a jury for resolution. *See Van T. Junkins & Assoc. v. U.S. Industries, Inc.*, 736 F.2d 656, 658 (11th Cir.1984). As to materiality, "the substantive law will identify which facts are material. Only disputes that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgement." *Anderson*, 477 U.S. at 248. For a question of fact to be "genuine," there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgement may be granted." *Id.* at 249–50. The party opposing summary judgement must show that there is more than simply some metaphysical doubt about the material facts. *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir.1995). Only those doubts about facts that are reasonable must be resolved in favor of the nonmovant. *Id.* at 953.

### III. Facts

Plaintiffs were employed as assistant district managers and district managers for the Athens Daily News, the morning newspaper published by Athens Newspapers, Inc. While Plaintiffs were assistant managers, their salaries were $240 per week. Benito Cavaliere remained an assistant manager throughout his tenure, while Bormic Webb, Melissa Tant and Bob Robbins were at some point promoted to district manager. While district manager Ms. Webb earned $300 per week and Ms. Tant and Mr. Robbins earned $325 per week. Plaintiffs were also paid a flat mileage fee, which they contend is much lower than the actual mileage incurred.

Each Plaintiff was assigned a district consisting of numerous newspaper routes.[1] Plaintiffs had numerous responsibilities, including the recruitment of carriers whenever routes became "open." Plaintiffs did not hire the carriers, but after recruiting a potential carrier, the district manager decided whether to recommend that the Newspaper contract with the carrier. They also did not fire carriers, but if one of the Plaintiffs determined that a carrier was creating excessive problems and should be terminated, they recommended termination to their superior. The district manager was also responsible for resolving customer problems and other issues with the carriers, as well as discussing solutions with the carrier if he or she was unable to distribute the paper on a certain day.

If a route was without a carrier for any reason (and was therefore "open"), Plaintiffs either located a substitute carrier or personally drove the route. When Plaintiffs had to drive the route, they were required to do all the work involved, including going to the drop station, picking up the bundles, counting out papers and stuffing each into plastic bags. Plaintiffs additionally delivered papers on "service call" to individuals who informed the Newspaper that their paper had not been delivered that day. These duties required Plaintiffs to drive newspapers to subscribers almost every day they worked at Athens Newspapers. The newspapers Plaintiffs delivered often contained supplements received from outside the state of Georgia for delivery to the consumer without any processing or

---

1. Plaintiffs testified in their depositions that their duties did not change when they were promoted to district manager. Therefore, any description of Plaintiffs' duties applies to all Plaintiffs, including Mr. Cavaliere, and applies to duties performed throughout their entire careers.

change in form or substance by Athens Newspapers.

As an additional part of their duties, Plaintiffs promoted sales of the newspaper, receiving bonuses if they increased circulation by a certain amount. Plaintiffs also had to bill and collect subscriber fees when a carrier had failed to complete his billing or when a route was without a carrier. Along the same lines, Plaintiffs were charged with recommending that a customer's subscription cease if he frequently failed to pay. Other miscellaneous responsibilities, including verifying names and addresses of customers for delivery lists and putting stickers on the mailboxes of these customers, required Plaintiffs to go door-to-door. When a district was without a manager, Plaintiffs had to cover for that district. In sum, the job of district manager required Plaintiffs to perform many tasks, some of which involved manual labor.

## IV. Discussion

The Fair Labor Standards Act of 1938 ("FLSA") established minimum labor standards in order to eradicate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202 (1997). *See United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). Under the FLSA, covered employees, which include those engaged in commerce or in the production of goods for commerce, must be paid the minimum wage for each hour worked and must be paid at one and one-half times their regular rate of pay for hours worked in excess of 40 in a workweek. 29 U.S.C. §§ 206, 207.

There is no dispute that Plaintiffs are covered under the Act. Plaintiffs claim, therefore, that they are entitled to regular wages as well as overtime compensation for hours worked over forty each week. There are, however, several exemptions that restrict or modify these provisions, some of which Defendant relies on in its motion for summary judgment.

**A. Minimum Wage and Overtime Exemption–Sections 13(a)(1) and 13(d)**

### 1. Section 13(a)(1)

Under section 13(a)(1) of the FLSA, persons employed in a bona fide administrative capacity are exempt entirely from the minimum wage, overtime pay and timekeeping requirements. 29 U.S.C. § 213(a)(1). The determination of when an employee qualifies for this exemption is made under alternative tests: the "short test" and the "long test." The short test applies to employees paid a salary not less than $250 per week; the long test to employees paid not less than $155 per week. As assistant district managers, Plaintiffs were paid less than $250 but more than $155 per week; Plaintiffs who were promoted to district manager were all paid in excess of $250 per week. Therefore, both tests apply to some period of employment of some or all Plaintiffs.

For Plaintiffs to be exempt under the "short test" the evidence before the Court must show that:

> Plaintiffs' primary duty consisted of the performance of office or non-manual work directly related to management policies or general business operations of their employer or their employer's customers; and Plaintiffs' primary duty included work requiring the exercise of discretion and independent judgement.

29 C.F.R. § 541.2(e)(2). Defendant claims that Plaintiffs were administrative employees because: their primary duties involved managing the efficient delivery of the newspapers; these duties were directly related to the management policies and business operations of Athens Newspapers; and the duties involved the exercise of discretion and independent judgement.

Within the language of this test are several fact-sensitive inquiries, such as: the amount of time Plaintiffs devoted to administrative duties versus manual tasks; the significance of these duties; and whether Plaintiffs were actually exercising discretion and independent judgement, as opposed to merely applying a determined standard or procedure.[2]

---

**2.** As the statute points out, use of 'discretion and independent judgement' is most frequently confused with the use of skill in applying techniques, procedures or specific standards and with decisions relating to matters of little consequence. 29 C.F.R. § 541.207(b).

Based on the facts as alleged by Plaintiffs (which include claims of significant manual work, e.g. delivering papers and other door-to-door, manual-type jobs), it appears to the Court that genuine issues of material fact exist. Genuine issues of material fact also exist under the "long test," which not only incorporates the language from the "short test," but also adds additional layers of inquiry, making it a more difficult standard to meet. Accordingly, summary judgement as to minimum wage, overtime pay and time-keeping requirements under section 213(a)(1) is denied.

### 2. Section 13(d)

Defendant also claims that even if work done by Plaintiffs in delivering newspapers is not covered under the administrative exemption, it is nonetheless exempt under section 13(d) of the Act, which specifically exempts delivery of open routes and "service" copies. *See* 29 U.S.C. § 213(d). Under the regulations, an employer may combine or "tack" exempt work under one exemption with exempt work under another exemption. Defendant therefore argues that Plaintiffs' exempt delivery work can be "tacked" onto their exempt administrative work, which would make all the work done exempt.

However, the regulations require that a party be exempt under both exemptions before they can be "tacked." Because genuine factual issues exist as to the administrative exemption, the section 13(d) exemption cannot be utilized until those issues are resolved. Therefore, summary judgement as to the section 13(d) exemption is denied.

### B. Overtime Exemption–Section 13(b)(1)

■ Defendant also seeks to apply section 13(b)(1) of the FLSA, which provides an exemption from the maximum hours and overtime requirements of section 7 of the Act. An employee is exempt from the benefits of this provision if he is an "employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act of 1935." [3] 29 C.F.R. § 782.1(a). The Motor Carrier Act ("MCA") extends the power of the Secretary of Transportation to "motor carriers engaged in interstate commerce." 49 U.S.C. § 302(a). Interstate commerce is defined under the MCA as "commerce between any place in a State and any place in another State or between places in the same State through another State...." [4] 49 U.S.C. § 303(a)(10). Therefore an employee is subject to the power of the Secretary of Transportation if the employee, in the performance of his or her duties, affects the safe operation of motor vehicles transporting goods in interstate commerce on public roadways. 49 U.S.C. §§ 31502, 13501.

Plaintiffs concede that their duties required them to drive newspapers to subscribers almost every day they worked at Athens Newspaper. Testimony of Kenneth Fowler, Assistant Circulation Director for Defendant, shows that the newspaper contained supplements [5] at least six and sometimes seven days a week, many of which were printed outside the state of Georgia. As Defendant's argument goes, when Plaintiffs delivered newspapers containing these supplements

**3.** It is not material whether these qualifications have actually been established by the Secretary of Transportation. The only consideration is whether the employee comes within his power to do so. If the employee comes within such power, he is automatically excluded from the benefits of section 7 of the FLSA. *See Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37, 42 (5th Cir.1962).

**4.** "It should be noted that the definition of 'interstate commerce' under the Motor Carrier Act is not the same as the definitions under the FLSA that are applied in determining whether an employee is within the general coverage of the wage and hour provisions as an employee 'engaged in commerce.' Thus, transportation activities in interstate commerce that may be sufficient to establish coverage under the FLSA may not constitute transportation that DOT has power to regulate and that provides a basis for invoking the § 13(b)(1) exemption." *Federal Wage and Hour Laws*, THE LABOR LAW HANDBOOK (Illinois Institute for Continuing Legal Education), May, 1996.

**5.** These were printed materials such as the Sunday color comics, magazines, coupons and other types of advertising. The companies providing these materials were located in Pennsylvania, Alabama, Florida, Tennessee, South Carolina, Indiana, North Carolina and Minnesota, among others.

printed outside of Georgia to their final intended destination in Georgia they were part of a "practical continuity of movement" across state lines from the point of origin to the point of destination and were therefore exempt from the FLSA under section 13(b)(1).

As Plaintiffs admit, it is clear under the case law that any transporter of goods in this movement from departure point until final destination point is subject to the Secretary's power under the MCA, even if his role is merely a small part of the movement and wholly performed within the state of departure or delivery. Therefore, if the final destination of the newspaper supplements is the homes of customers, then Plaintiffs were involved in the "practical continuity of movement" and exempt under section 13(b)(1). On the other hand, if the interstate movement of the supplements ended at Defendant's warehouse, then Plaintiffs' subsequent transportation of newspapers containing supplements was wholly intrastate and therefore outside the exemption.

Under the applicable Department of Transportation standard, the test for determining the destination point at which interstate movement comes to an end centers around an analysis of where the shipper intends the shipment to reach. The three-pronged test is codified as follows:

> [T]ransportation confined to points in a single State from a storage terminal of commodities which have had prior movement ... from an origin in a different state is not in interstate or foreign commerce within the meaning of ... the Act if the shipper has no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment.... [T]here is not fixed and persisting intent where (i) at the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is

specifically arranged only after sale or allocation from storage.

29 C.F.R. § 782.7(b)(2).

The nonjudicial enforcement and interpretation of the FLSA is done by the Department of Labor through the Administrator of its Wage and Hour Division. *See* 29 U.S.C. § 204. As a result, the views of the Administrator on the applicability of the section 13(b)(1) exemption have been "expressed in interpretations issued from time to time ... to make available in one place general interpretations of the Administrator which will provide 'a practical guide to employers and employees as to how the office representing the public interest in enforcement of the law will seek to apply it.'" 29 C.F.R. § 782.0(a) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). Although these interpretations are not binding on the courts,

> [t]he interpretations ... indicate, with respect to the scope and applicability of the exemption provided by section 13(b)(1) of the Fair Labor Standards Act, the construction of the law which the Secretary of Labor and the Administrator believe to be correct in the light of the decisions of the courts ... and ... the Secretary of Transportation, and which will guide them in the performance of their administrative duties under the act unless and until they are otherwise directed by authoritative decisions of the courts or conclude upon reexamination of an interpretation that it is incorrect.

29 C.F.R. § 782.0(b).

In light of this statement, Defendants direct the Court to the Wage and Hour Division's *Field Operations Handbook* ("FOH") ("Exhibit A" to Defendants' Brief in Support of Motion for Summary Judgement), which contains interpretations of the Administrator as they relate to specific employment situations. Section 24d00(b) of the FOH addresses application of the section 13(b)(1) exemption as it relates to persons transporting and delivering newspapers:

> (a) The delivery of newspapers within the state in which they are printed is not transportation over which the DOT has jurisdiction. While such delivery drivers

are engaged in the interstate communication or transmission of news so as to be covered by the FLSA, they are not transporting property (the newspaper) in interstate or foreign commerce within the meaning of the Motor Carrier Act.

(b) Certain newspapers of the type described in (a) above contain as an integral part weekly supplements, such as comics, magazines and the like, which are produced outside the State. If these supplements are contained by the newspaper in complete and finished form and no processing work is performed on them by the newspaper establishment, the movement within the State of the supplements printed out of State constitutes part of a practical continuity of movement of die goods from the point of origin to the ultimate destination. Thus, the See 13(b)(1) exemption is applicable to the delivery drivers who transport and deliver the newspaper containing the supplements. The temporary storage of the supplements at the newspaper establishment awaiting insertion into the paper does not change the interstate character of the transportation. FOH § 24d00(b) (1981).

Plaintiffs attempt to discredit this FOH interpretation by contending that it is inconsistent with the Secretary of Transportation's "fixed and persisting intent" requirement and therefore should not be considered by the Court. Rather, Plaintiffs contend the correct analysis of "fixed and persisting intent" is found in *Baird v. Wagoner Transportation Co.*, 425 F.2d 407 (6th Cir.1970).

*Baird* involved the transportation of petroleum products by Wagoner Transportation ("Wagoner"), a motor carrier for hire that transported the product for Standard Oil of Indiana ("Standard"). The drivers for Wagoner were awarded overtime back pay by the district court, which found that they were not covered under the 13(b)(1) exemption. The decision was affirmed on appeal by the Sixth Circuit, which analyzed the facts under the "fixed and persisting intent" test.

The drivers never transported the petroleum outside the state of Michigan. The oil was shipped by Standard to Wagoner's terminal in Michigan "on the basis of highly sophisticated forecasts of its customers' needs." *Id.* 425 F.2d at 409. If the projec-

tions fell short, Standard would borrow or buy petroleum from nearby competitors to fill the orders. All customer orders were placed with Standard's sales department, which then informed Wagoner of the quantities and destinations of the products for points within Michigan. The court found that the 'through-put' of the terminal in any given year was about six times the tank capacity at the terminal. Based on this fact, the court estimated that if the terminal tanks were, on average, half fall, then the petroleum products at the terminal would be inventoried for an average of one month.

The court looked to the three-pronged DOT test for determining when no "fixed and persisting intent" exists. At prong one, 'specific orders' of a 'specific quantity' were not moved from one state through the terminal storage of a second state to a specific customer; instead, shipments were based only on sophisticated forecasts, with the 'specific quantity' to be shipped not fixed at the time of shipment to the terminal storage. At prong two, the court found that the terminal could properly be characterized as a 'local marketing facility' because the annual 'through-put' of petroleum products was only six times storage capacity and the goods were inventory-in-store for actual orders to be placed by customers, with no portion of the products having been allocated before they arrived at the terminal. At the third prong, the court found that no transportation arrangements were made until after the petroleum products were inventoried at the terminal. Based on these findings, the court found the drivers were not engaged in 'interstate commerce' within the meaning of the MCA.

The court also distinguished several other cases in which the exemption applied. One of these was *Galbreath v. Gulf Oil*, 413 F.2d 941 (5th Cir.1969), a case that is binding precedent on this Court. The plaintiffs in *Galbreath* were employee-truck drivers who sought overtime compensation from their employer-oil company. The employees drove transport trucks from the employer's Atlanta Bulk Plant, delivering petroleum products that were distributed primarily to the employer's retail service stations and consuming

accounts. They performed these duties solely within the state of Georgia. The petroleum arrived at the Atlanta facility from Gulfs refineries in either Texas or Mississippi via a 36–inch pipeline owned by Colonial Pipeline Company.[6]

In many ways the facts in *Galbreath* parallel those in *Baird,* yet the results are different. However, this is not attributable to a difference of opinion between the circuits but to subtle factual distinctions between the cases that explain, even necessitate, the different outcomes. Rather, these subtle factual differences highlight how slender is the reed on which the applicability of the exemption may at times rest.

Both courts found that the products were shipped on the basis of forecasts. However, the forecasts in *Galbreath* were highly accurate and were based on preexisting contractual commitments with retail gas dealers and Gulf's 'consuming accounts', all of which were actual, existing contracts to meet the needs of specific customers. This is in contrast to the forecasts in *Baird,* which were based only on projections and where the specific quantity to be shipped to customers at the time of shipment to the terminal storage was not fixed.

At prong two, the terminal storage in *Galbreath* was used for a very short period of time (products were shipped on a 7–10 day cycle with no more than 15 days storage supply held in the bulk plant at any one time), as the petroleum was moved according to a predetermined schedule on a regular basis. The average inventory time for the petroleum in *Baird* was one month, and no portion of the products was allocated before they reached the terminal.

Along the same lines at prong three, the products in *Galbreath* were delivered according to transportation arrangements made before they arrived at the terminal, compared to no such arrangements in *Baird.* In sum, the facts in *Galbreath* indicate that Gulf, the shipper, intended the shipments of petroleum to reach specific end destinations beyond the terminal storage point. As such, the transportation of the goods was within 'interstate commerce' and therefore within the section 13(b)(1) exemption.

The facts in the case before the Court lead to the same conclusion. The uncontradicted affidavit testimony of Kenneth Fowler, Assistant Circulation Director for Defendant Athens Newspapers, shows that printed materials called "supplements" are printed outside Georgia and shipped to Defendant for inclusion in Defendant's newspapers. Among these supplements are the Sunday color comics, magazines such as Parade, coupons and other types of advertising. These supplements are shipped at the behest of advertisers, who place orders with Athens Newspapers to have these supplements included in the paper. These orders are placed before any of the advertisers ship the supplements to Athens Newspapers. In these orders, the advertisers indicate the target areas they wish to receive the supplements, such as certain counties, as well as the date for delivery. These supplements are stored for a short period, normally between two and ten days, and then inserted without any change in form into the newspaper on the day specified by the advertisers.

At prong one of the DOT test, the supplements appear to be shipped on the basis of forecasts. Following the logical progression of the testimony of Mr. Fowler, the advertisers place orders with Athens Newspapers for delivery to certain areas based on forecasts or projections of what the subscriber base for that area will be at the time of delivery. Like the forecasts in *Galbreath,* these forecasts are highly accurate (presumably as accurate as is possible, given the fact that the number of subscribers may change on a daily basis) and are based on preexisting contractual commitments between Athens Newspapers and its customers. At prong two, the storage terminal is used for a very short period of time, normally between two and ten days, and the inserts are moved on a regular basis according to a predetermined schedule.

---

**6.** Colonial Pipeline was a corporation owned by nine major oil companies, including Gulf, which owned 14%. Gulf would tender to Colonial at one of its refineries a 'slug' of Gulf products destined for delivery points at Atlanta and other locations on the main line. Gulf would then 'bleed off' at the Atlanta terminal an amount of the tendered product determined prior to tender to Colonial.

At prong three, transportation is arranged with Athens Newspapers through its delivery drivers before the supplements arrived at the terminal. All these facts indicate that the final destination points for the supplements were the homes of Athens Newspapers' customers.

Yet the strongest evidence of this intent does not fall neatly under the three-pronged DOT test. The supplements involved here are nonfungible goods, unlike the petroleum in either *Baird* or *Galbreath*. Supplements such as the Sunday comics and Parade magazine, as well as others, are dated materials. As such, the advertisers only receive the intended benefit from them if they reach the consumers on the dates printed on the supplements. While petroleum is fungible and may be used at a later date than that first intended if forecasts miss the mark and cause more to be shipped than needed, such is not the case with dated newspaper supplements. Once the date on the supplement has passed, the supplement is worthless to the advertiser.[7] The nonfungible nature of these supplements makes it apparent that Plaintiffs were engaged in "interstate commerce" within the meaning of the section 13(b)(1) exemption in the transportation of these supplements, whose final destination points were the homes of Athens Newspapers' customers.

In their argument against application of the section 13(b)(1) exemption, Plaintiffs maintain that their delivery duties were not a "substantial" part of their overall responsibilities, which they maintain is required for MCA coverage. Plaintiffs argue that in order to determine whether these delivery duties were "substantial" the Court must make a factual determination of how many hours Plaintiffs worked and then a factual determination of how many of those hours were spent delivering newspapers. This is incorrect:

> As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is ... called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities of the character described in paragraph (b)(2) of this paragraph, he comes within the exemption.... [T]he rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work affecting "safety of operation."

29 C.F.R. § 782.2(b)(3).

As Defendant correctly points out, "[i]t is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power." *Levinson v. Spector Motor Service*, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). The record is clear that Plaintiffs' activities included regular delivery of newspapers containing supplements. The Court need not determine what percentage of total hours worked by Plaintiffs were spent delivering papers. Summary judgement as to the section 13(b)(1) exemption is therefore proper.

---

7. In opposition to Defendant's motion for summary judgement, Plaintiffs argue that Kenneth Fowler's affidavit testimony that these advertisers specified to the shipper the specific quantity of a supplement for a particular geographic area is insufficient evidence to determine the issue on summary judgement. Instead, Plaintiffs argue that voluminous documentary evidence is needed, namely: (1) advertisers' order forms predating delivery and specifying quantities needed for each and every shipment; (2) corresponding documents from the shippers indicating that the exact amount specified on these forms were shipped, and; (3) documents showing the number of customers to be exactly equal to the number of supplements shipped. This is not the case. The Court takes judicial notice of the fact that certain types of advertising supplements, including those involved in this case, are dated materials. As such, the incentive for the advertiser shipping these supplements is to ship as close to the exact number needed as possible. Any amount shipped over the number needed is worthless, because as dated material these cannot be reused. While it is true that it is virtually impossible for the shippers of these supplements to ship precisely the exact amount needed (again, the precise number of newspaper subscribers in a multi-county area likely changes on a regular, perhaps daily, basis), the fact that they are unable to do so does not mean the supplements were not intended to be shipped beyond the terminal point to the customers.

## V. Conclusion

The Court hereby grants Defendant Athens Newspapers' Motion for Summary Judgement as to the applicability of the section 13(b)(1) exemption under the FLSA, meaning that Plaintiffs are exempt from the overtime wage requirements of section 7 of the Act. However, the motion is denied as it relates to the section 13(a)(1) and 13(d) exemptions.