786 So.2d 464 (2000)
Ex parte Hugh STEWART.
Ex parte Kameron Hyde.
(Re Hugh Stewart v. The Birmingham News Company; and Kameron Hyde v. The Birmingham News Company).
1990418 and 1990419.
Supreme Court of Alabama.
September 22, 2000.
Order Overruling Applications for Rehearing December 1, 2000.
*465 Leah O. Taylor of Taylor & Taylor, Birmingham (rehearing brief filed by Leah O. Taylor and Rhonda Pitts Chambers of Taylor & Taylor, Birmingham), for petitioners.
James P. Pewitt of Johnston, Barton, Proctor & Powell, L.L.P., Birmingham, for respondent.
PER CURIAM.
Hugh Stewart and Kameron Hyde, the plaintiffs in actions pending in the Jefferson County Circuit Court, have petitioned for a writ of mandamus directing the trial court to vacate its order compelling them to submit their claims to arbitration. We deny the writs.
The Birmingham News newspaper is published by The Birmingham News Company ("The News") and is sold through a mixed distribution system consisting of employees of The News and independent dealers ("Dealers") who are authorized to act as the exclusive distributors of the newspaper in specific geographical areas. The plaintiffs became Dealers by executing an "Independent News Dealer Agreement" (the "Agreement") with The NewsStewart in 1988 and Hyde in 1994. Pertinent portions of the Agreement read:
"4. Deliveries:

"[Dealers] shall make regular and prompt deliveries on the date of publication of complete newspapers intact, including preprints, supplements, and inserts designed by [The News] only, to his subscribers and customers in a manner *466 satisfactory to them (e.g., in a dry and readable condition)....
". . . .
"8. Term:

"This Agreement shall exist and be in force until [one year from date of execution], and thereafter shall be automatically renewed from year to year unless terminated by either party by giving the other party written notice of termination on or before thirty (30) days prior to the annual renewal date. In the event of the failure of either party to perform any of its obligations under the Agreement, the other party may terminate this Agreement upon prior written notice, subject, however, to the provision of Paragraph 10 herein. Notice shall be given hereunder by depositing the same in the United States mail, postage prepaid, and addressed to the other party at his business hereinabove set out.
". . . .
"10. Arbitration:

"Except as herein provided, and as provided in any other provision of this Agreement, all claims and controversies arising out of this contract shall be submitted to arbitration for determination. It is agreed, however, that if either party shall terminate this contract by reason of the alleged breach thereof by the other party, the sole issues for determination shall be whether or not the termination was valid, whether or not either party shall be entitled to money damages, and, if so, the amount thereof, which issues only shall be submitted to arbitration. It is expressly agreed that in case of such termination neither party shall be entitled to have this Agreement reinstated nor to be restored to his or its status thereunder, notwithstanding the fact that it may be determined that the termination by the other party was not warranted...."
According to the plaintiffs, in 1997 The News made changes to its distribution system that adversely affected the Dealers' ability to function properly under the Independent News Dealer Agreement. For example, the plaintiffs contend that The News changed its customer-rating procedures in a way that caused Dealers to be held responsible for complaints about service problems over which they had no control. In 1998, The News notified the plaintiffs that their Agreements would not be renewed because, it said, complaints about their service "were at a totally unsatisfactory level."
Although the Agreement provided that either party could terminate it without cause by giving written notice 30 days before its expiration, the plaintiffs sued The News, each alleging that the Agreement obligated The News to act in good faith and to maintain a relationship with a Dealer as long the Dealer performed satisfactorily, and that the "unsatisfactory-performance" reason given for nonrenewal of their contracts was a pretext. The plaintiffs claimed that The News had engaged in a scheme designed to eliminate the Dealers and to obtain their distributorships (which, the plaintiffs allege, had become very profitable over the years), without compensation, in order to obtain the Dealers' profits and to establish a monopoly in the newspaper publishing and retaildistribution market. The plaintiffs alleged breach of contract, fraud, conspiracy, violation of Alabama's antitrust statute (Ala. Code 1975, § 6-5-60), unjust enrichment, tortious interference with a business relationship, and deceptive trade practices.
The News moved to stay the proceedings in the circuit court and to compel arbitration pursuant to Paragraph 10 of the Agreement. The plaintiffs opposed the motion. After a hearing on the motion, the trial court granted it and ordered *467 the parties to arbitrate. The plaintiffs now seek a writ of mandamus directing the trial court to vacate its order compelling arbitration of their claims against The News.
Mandamus is an extraordinary remedy and requires a showing of 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court. When an appellate court engages in mandamus review of a trial court's order granting a motion to compel arbitration, the appellate court applies a de novo standard of review. See Ex parte Inverness Constr. Co., 775 So.2d 153 (Ala.2000); Ex parte Stamey, 776 So.2d 85 (Ala.2000); Ex parte Roberson, 749 So.2d 441 (Ala.1999).
In Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), the United States Supreme Court held that the words "involving commerce" in the Federal Arbitration Act, 9 U.S.C. § 2 ("FAA"), are broader than the often-found words of art "in commerce." The Court held, therefore, that they cover more than only persons or activities within the flow of interstate commerce. See Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) (defining "in commerce" as related to the "flow" and defining the "flow" to include "the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer"). The Court went on to hold that the word "involving" is the functional equivalent of the word "affecting," and that the phrase "affecting commerce" normally signals a congressional intent to exercise its Commerce Clause powers to the full. 419 U.S. at 201, 95 S.Ct. 392.
The plaintiffs contend that nothing in the Agreement indicates that it involves interstate commerce within the meaning of the FAA; they further contend that an affidavit filed by The News in support of its motion merely established that The News engages in interstate commerce. The plaintiffs argue that the trial court erred by focusing, they say, on the "overall business" of The News rather than on the limited transactions evidenced by the Agreement.
The News bore the burden of proving to the trial court that the Agreement involved interstate commerce, so as to invoke the FAA and render enforceable the arbitration clause in the Agreement. Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000); Transouth Fin. Corp. v. Bell, 739 So.2d 1110 (Ala.1999).
Attached to The News's motions to stay the civil actions and to compel arbitration were affidavits of Toby Pearson, the circulation director for The News. In his affidavits, Pearson acknowledged that the plaintiffs and The News had entered into the Agreement and that under the Agreement the plaintiffs bought complete newspapers from The News and distributed them to homes, newsstands, news racks, and other places within defined territories for the period of a year. Pearson affirmed:
"3. Virtually all of the inserts that are included as part of The Birmingham News, such as Sunday comics, Parade magazine, React magazine, and advertising inserts for national retail chains such as Rich's, Sears, and others, are prepared, printed, and shipped to The News from companies located outside the State of Alabama.
"4. The News also obtains a significant portion of its news content and photographs from outside the State, under *468 agreements with news services such as The Associated Press, Universal Press, Knight Ridder Tribune, and King Features."
The plaintiffs do not dispute this. Therefore, the Agreement required them to distribute advertising inserts designated by The News as part of the complete newspaper, which were prepared, printed, and shipped to The News in interstate commerce, and news content, designated as part of the complete newspaper by The News, that was obtained by The News in interstate commerce.
Did the flow of interstate commerce end when these inserts and this news content were delivered to The News? The plaintiffs contend it did, and the dissenting Justices agree. The plaintiffs cite the following cases to support their contention: United States v. American Bldg. Maintenance Indus., 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975); Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Burke v. Ford, 377 F.2d 901 (10th Cir.1967); Page v. Work, 290 F.2d 323 (9th Cir.1961); Wirtz v. M & B Constr. Co., 216 F.Supp. 169 (S.D.Fla.1963); Ouendag v. Gibson, 49 F.Supp. 379 (W.D.Mich.1943); Hurst v. Tony Moore Imports, Inc., 699 So.2d 1249 (Ala.1997).
The News contends that the plaintiffs were an integral part of a system for delivering commercial advertising distributed in interstate commerce, citing, among other cases, Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); and Evening News Publ'g Co. v. Allied Newspaper Carriers of New Jersey, 263 F.2d 715 (3d Cir.1959), cert. denied, 360 U.S. 929, 79 S.Ct. 1449, 3 L.Ed.2d 1544 (1959).
In Lorain Journal, the United States Supreme Court analyzed the interstate activity of a daily newspaper located in Lorain, Ohio:
"The distribution within Lorain of the news and advertisements transmitted to Lorain in interstate commerce for the sole purpose of immediate and profitable reproduction and distribution to the reading public is an inseparable part of the flow of the interstate commerce involved."
342 U.S. at 152, 72 S.Ct. 181.
The United States Court of Appeals for the Third Circuit reached the same conclusion in Evening News, which involved a group of news dealers who tried to force a newspaper to eliminate home delivery of some of its newspapers by newsboys. The newspaper sued the dealers, alleging violations of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). The dealers argued, as the plaintiffs argue here, that their relationship with the newspaper was intrastate in nature because they delivered newspapers only within their home state. The Third Circuit disagreed with the dealers:
"The truncated argument advanced would have us forget completely that interstate commerce is an inseparable, indispensable part of this ... newspaper. The News does furnish neighborhood, city, county and state news to its readers. And by far the major portion of its sales are in New Jersey. But an essential element of its being (perhaps considering its territory and the present state of this world of ours its most essential element) is the obtaining, dissemination and interpretation of national and world-wide news. Intrastate advertising is necessary to the economic life of the paper and necessary to its readers. Interstate advertising affects the paper and its readers to a lesser degree but affect them it does appreciably. To place that news and advertising in the *469 hands of New Jersey people requires, as the United States Supreme Court said in [Lorain], `continuous interstate transmission of materials and payments to say nothing of the interstate commerce involved in the sale and delivery of product[s] sold.' The end result, the distribution of the News, as a complete newspaper containing those news items and advertisements, to its reading public in Newark or any other New Jersey area is, as the Court held in [Lorain], `... an inseparable part of the flow of the interstate commerce involved.'"
263 F.2d at 717.
The Third Circuit found that "home delivery of the News is an integral part of the interstate operation." 263 F.2d at 717. We agree with the Third Circuit's application of Lorain, and we conclude that the cases of the plaintiffs now before us are not materially distinguishable from either Lorain or Evening News.[1]
The petitions for the writ of mandamus are due to be denied. The trial court properly directed arbitration pursuant to the arbitration clauses in the Agreement because the plaintiffs were integral and inseparable parts of the flow of interstate commerce. Lorain and Evening News.
1990418WRIT DENIED.
1990419WRIT DENIED.
HOOPER, C.J., and MADDOX, BROWN, and JOHNSTONE, JJ., concur.
HOUSTON, J., concurs specially.
COOK, LYONS, and ENGLAND, JJ., dissent.
SEE, J., recuses himself.
HOUSTON, Justice (concurring specially).
I go with the flow.
I concurred in Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000). If, as the dissenting Justices contend, Sisters of the Visitation is precedent for granting these mandamus petitions, then I misunderstood what I was voting on in Sisters of the Visitation and I should have concurred only in the result in that case. In my opinion, neither the words nor the reasoning of the majority opinion in Sisters of the Visitation has any precedential value in a case involving an activity in which the flow of commerce must continue in order to fulfill the purpose of the activity.
LYONS, Justice (dissenting).
I respectfully dissent. The per curiam opinion ignores Chief Justice Rehnquist's description in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), of the three categories of regulation subject to the power of Congress under the Commerce Clause of the United States Constitution, and it fails to distinguish Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000).
Chief Justice Rehnquist in Lopez referred to the channels, instrumentalities, and activities having a substantial relation to commerce. We recognized these categories in Sisters of the Visitation.
The first category, regulation of the use of the channels of interstate commerce, involves management of the avenues of commerce and control over the items that might move through them, such as intoxicating liquors, convict-made goods, and *470 stolen goods. Lopez, 514 U.S. at 558-59, 115 S.Ct. 1624. See, also, Gibbs v. Babbitt, 214 F.3d 483 (4th Cir.2000) ("The term `channel of interstate commerce' refers to, inter alia, `navigable rivers, lakes, and canals of the United States; the interstate railroad track system; the interstate highway system; ... interstate telephone and telegraph lines; air traffic routes; television and radio broadcast frequencies).'" 214 F.3d at 490-91 (quoting United States v. Miles, 122 F.3d 235, 245 (5th Cir.1997), cert. denied, 523 U.S. 1011, 118 S.Ct. 1201, 140 L.Ed.2d 329 (1998)).
The second category, regulation of the instrumentalities of interstate commerce, protects things in interstate commerce, for example, by regulating the safety of motor vehicles. Lopez, 514 U.S. at 558-59, 115 S.Ct. 1624; Gibbs v. Babbitt, 214 F.3d at 491. That an item may move in interstate commerce does not make it an instrumentality, or else the weapons shipped in interstate commerce giving rise to violations of the Gun Free School Zones Act of 1990 would have sufficed to place 18 U.S.C. § 922(q), which was before the Supreme Court in Lopez, in the category of regulation of instrumentalities of commerce.
Based upon the illustrations given in Lopez dealing with the three categories, I conclude that the delivery of newspapers is not a channel of interstate commerce or an instrumentality of interstate commerce. A contract is neither a channel nor an instrumentality, but suggests instead an activity. The Federal Arbitration Act requires arbitration of "a contract evidencing a transaction involving commerce," 9 U.S.C. § 2, and it defines "commerce" as "commerce among the several States or with foreign nations," 9 U.S.C. § 1. This case, therefore, falls in the third Lopez category, dealing with activities; therefore, as was held in Lopez, to be subject to regulation by the Congress, the activity must have a substantial effect on interstate commerce.
In order to decide the questions these plaintiffs present, we must, just as we did in Sisters of the Visitation, confront Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), where the Supreme Court upheld the constitutionality of regulation of homegrown wheat pursuant to an act of Congress controlling prices of wheat. In Lopez, the Court referred to Wickard as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity." 514 U.S. at 560, 115 S.Ct. 1624. Recently, in United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Court stated: "[I]n every case where we have sustained federal regulation under Wickard`s aggregation principle, the regulated activity was of an apparent commercial character." 529 U.S. at 611 n. 4, 120 S.Ct. at 1750 n. 4 (emphasis added). The Court's describing Wickard as "the most far reaching example" and its referring to "Wickard`s aggregation principle" suggest that Wickard is not a standard to be trotted out and applied willy-nilly whenever Congress attempts to regulate activities in interstate commerce. At stake in Wickard was Congress's attempt to control prices.
The aggregated effect of a determination that the activity in Wickard was wholly intrastate would have frustrated the Congressional purpose for controlling the price of wheat. In Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), and Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey, 263 F.2d 715 (3d Cir.), cert. denied, 360 U.S. 929, 79 S.Ct. 1449, 3 L.Ed.2d 1544 (1959), the two antitrust cases relied on by the per curiam opinion, the relevant Congressional scheme was to prevent monopolies and restraints of trade. In Evening News, the United *471 States Court of Appeals for the Third Circuit observed:
"The end result, the distribution of the News, as a complete newspaper containing those news items and advertisements, to its reading public in Newark or any other New Jersey area is, as the Court held in Lorain (342 U.S. at page 152, 72 S.Ct. at page 185), `* * * an inseparable part of the flow of the interstate commerce involved.' That Court said further (342 U.S. at page 152, 72 S.Ct. at page 186), `Without the protection of competition at the outlets of the flow of interstate commerce, the protection of its earlier stages is of little worth.' ... It should be noted that in Lorain, as here, the contention was that merely a local issue was in dispute."
263 F.2d at 717-18 ("outlets" emphasized in Evening News; additional emphasis added).
We here deal with the Federal Arbitration Act, a statute requiring arbitration of contracts involving interstate commerce. I do not consider a statute whose purpose is to control wheat prices across the country or a statute whose purpose is to protect competition to be interchangeable with a statute authorizing arbitration. Both the FAA and the antitrust statute are grounded in the authority conferred upon Congress by the Commerce Clause, but the nexus between the applicability of the statute to local transactions and the fulfilment of the Congressional scheme is not nearly as direct or logical in the context of a statute calling for arbitration of disputes arising from contracts involving interstate commerce as it is in the context of a statute establishing price controls or regulating competition.[2] The case for applying "Wickard`s aggregation principle" is therefore not as compelling in regard to the FAA as it is in regard to statutes purporting to control prices or prevent monopolies.
How, then, do we strike a balance that respects Congress's authority and upholds the rights of states over local matters? The United States Court of Appeals for the Fourth Circuit discussed this issue in Gibbs v. Babbitt, dealing with the constitutionality of an act regulating the taking of red wolves on private land, as follows:
"Lopez and Morrison rest on the principle that where a federal statute has only a tenuous connection to commerce and infringes on areas of traditional state concern, the courts should not hesitate to exercise their constitutional obligation to hold that the statute exceeds an enumerated federal power. Respect for our federal system of government was integral to those decisions. See Lopez, 514 U.S. at 561 n. 3, 115 S.Ct. 1624, 131 L.Ed.2d 626; Morrison, [529 U.S. at 617-18,] 120 S.Ct. at 1754-55. Yet Lopez also counsels that `[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.' 514 U.S. at 560, 115 S.Ct. 1624, 131 L.Ed.2d 626. In enforcing limits on the Congress, we must be careful not to overstep the judicial role. To strike down statutes that bear substantially upon commerce is to overstep our own authority even as we fault Congress for exceeding limits on its power. The irony of disregarding limits on ourselves in the course of enforcing limits upon others *472 will assuredly not be lost on those who look to courts to respect restraints imposed by rules of law."
214 F.3d at 491-92.
I would strike the balance by relying upon the standard we set in Sisters of the Visitation, a standard that allows us to focus intensely on the specific transaction before the Court. While that standard considers other interstate contracts of one of the parties that operate in proximity to the contract before the Court ("proximity contracts"), it avoids automatically concluding that proximity to interstate contracts alone warrants the conclusion that the subject contract substantially affects interstate commerce. We held in Sisters of the Visitation, after creating a hypothetical transaction involving a farmer mowing pasture lands, a transaction that lacked a substantial effect on interstate commerce, as follows:
"This hypothetical transactionan agreement by the farmer to do work for another local landownermight contain the following components: (1) a contract solely between two local parties, both of them engaging in activities that do not involve any person or entity in another State; (2) tools and equipment, which, although they moved in interstate commerce, were not purchased or leased solely for the farmer to perform the particular contract at issue; (3) substantially more than half of the amount paid to the farmer by the other landowner is allocable to the cost of the services rendered by the farmer, who renders those services without using persons or entities from another State, while substantially less than half of the amount paid is allocable to the cost of materials specially purchased for use or consumption in the farmer's performance of the contract; (4) the object of the services is incapable of subsequent movement across State lines or otherwise having a subsequent substantial effect on interstate commerce; (5) such a degree of separability from any contracts that are subject to the FAA that allowing this contract to remain outside the scope of the Act would not substantially disrupt activities that Congress intended to be subject to the Act."
775 So.2d at 765. In the situation of the plaintiffs now before us, we have no material deviation toward interstate commerce from the hypothetical transaction described above.
In each of the two cases before us, the parties to the transaction are local, but one party, The News, is engaged in an activity that involves numerous contracts between it and out-of-state entities that provide a range of materials and services, including comics, Parade magazine, advertising inserts, news content, photographs, paper, and ink. Some of the printed materials expressly solicit interstate business transactions between advertisers and subscribers. The Dealers purchase polyethylene bags and rubber bands from The News. The News obtains these products from outside the State of Alabama. We, therefore, have a deviation toward interstate commerce from the hypothetical transaction based upon the relationship of the parties to other contracts, to which I will return later.
The News makes no showing as to whether equipment, such as delivery trucks and other vehicles necessary to perform the distribution contracts, moved in interstate commerce to the Dealers or were acquired for performance of this contract and used solely in performance of the contract. We have no deviation toward interstate commerce from the hypothetical transaction based upon equipment necessary for the performance of the contract.
*473 The News makes no showing as to the breakdown between the cost of local labor versus the cost of materials of interstate origin, such as equipment and gasoline necessary to the performance of the contract. We have no deviation toward interstate commerce from the hypothetical transaction based upon the costs attributable to interstate, as opposed to local, activity.
The newspapers subject to the contract are delivered locally. Any subsequent entrance into interstate commerce as a result of a local subscriber's mailing a clipping to another state is too incidental to warrant further consideration. The subscriber could respond to a solicitation for sale of a product from outside Alabama. However, we have no evidence as to the extent of such activity. We have no deviation toward interstate commerce from the hypothetical transaction based upon subsequent effect on interstate commerce.
The aforementioned proximity contracts are not linked to a showing that litigation, as opposed to arbitration, in connection with The News's contract with the Dealers, would disrupt performance of those proximity contracts with third parties. Indeed, we have no basis on which to conclude that the parties or potential witnesses to these proximity contracts have anything to do with the contract between The News and the Dealers. We have no deviation toward interstate commerce from the hypothetical transaction based upon disruption of proximity contracts with third parties.
The most difficult portion of the test is determining the effect of the proximity contracts and the Dealers' purchases from The News of materials that it obtains from outside Alabama. The materials resulting from the proximity contracts come to rest in Alabama, where The News processes and assembles the completed product. The advertising inserts do not move directly between the Dealer and the merchant purchasing the advertising. While the contract requires the Dealers to deliver the inserts, that activity is local. The rubber bands and polyethylene bags sold by The News to the Dealers come to Alabama and then are resold by The News to the Dealers. However, there is no indication that the dispute between the parties relates to the sale of these products.
Unquestionably, The News substantially affects interstate commerce in the performance of its proximity contracts. However, the separate contract for the distribution of newspapers affects interstate commerce only to the extent that (a) the contract requires involvement by the Dealers in interstate commerce to perform the contract for distribution, or (b) the distribution itself causes subscribers to purchase goods or services directly from outside Alabama. Based on the absence of evidence to quantify interstate activity in these areas, I am unable to conclude that the performance of the contract between the Dealers and The News has the requisite substantiality of effect on interstate commerce to justify applying the Federal Arbitration Act. To hold otherwise would assume that the framers of the United States Constitution intended that Congress could require arbitration of a contract between a local newspaper and a young person in the neighborhood who throws papers from his or her bicycle.
I must dissent, lest we give too much weight to the interstate activity of The News and thereby disregard the proper focus on the contract between The News and the Dealers and the question whether that contract substantially affects interstate commerce.
COOK, J., concurs.

*474 On Applications for Rehearing.

PER CURIAM.
APPLICATIONS OVERRULED.
HOOPER, C.J., and MADDOX, BROWN, and JOHNSTONE, JJ., concur.
HOUSTON, J., concurs specially.
COOK, LYONS, and ENGLAND, JJ., dissent
SEE, J., recuses himself.
HOUSTON, Justice (concurring specially).
In opposition to the applications for rehearing, the Birmingham News Company filed an excellent brief, which I quote from and adopt as part of my special concurrence:
"[The Supreme Court of Alabama's majority opinion] fits within the broad general category of cases that recognize the authority of Congress to regulate persons or things that are in some sense participating `in' interstate commerce. See Reno v. Condon, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000); United States v. Lopez, 514 U.S. 549, 557, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (`Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities') (emphasis added); Lawrence H. Tribe, American Constitutional Law, § 5-5, at 826 (3d ed.2000) (`[a]lthough the Court might more comfortably have described it as a separate category, Lopez located the regulation of "persons or things `in' interstate commerce," or "participating in" such commerce, in the instrumentalities branch of the Court's Commerce Clause doctrine'). The analysis or test described in Sisters of the Visitation does not apply to cases like this one, where the actual persons and things involved are themselves within the flow of commerce. See Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) (which defined `in commerce' as related to the `flow' and defining the `flow' to include `the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer'). Such persons and things, by definition, substantially affectbecause they are components ofinterstate commerce. See Lawrence H. Tribe, American Constitutional Law, § 5-5, at 827 (3d ed.2000).
"Judicial recognition of a `flow' of interstate commerce is not new. In 1905, Justice Holmes wrote as follows:
"`[C]ommerce among the States is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce.'
*475 "Swift & Co. v. United States, 196 U.S. 375, 399, 25 S.Ct. 276, 49 L.Ed. 518 (1905) (emphasis added). In 1943, in an opinion by Justice Douglas, the United States Supreme Court again discussed the movement of goods in a `current' of interstate commerce and the authority of Congress to regulate it, as well as those who participate in it. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943). In Walling, the Court found that the flow of interstate commerce did not necessarily cease once goods were delivered to a wholesaler located in the state of destination:
"`It is clear that the purpose of the [Fair Labor Standards Act] was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce. There is no indication ... that, once the goods entered the channels of interstate commerce, Congress stopped short of control over the entire movement of them until their interstate journey was ended. No ritual of placing goods in a warehouse can be allowed to defeat that purpose. The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer `in commerce' within the meaning of the Act. As in the case of an agency ... if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain `in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce.'
"Walling v. Jacksonville Paper Co., 317 U.S. 564, 567-68, 63 S.Ct. 332, 87 L.Ed. 460 (1943). Finding that the wholly intrastate delivery of various paper products (including newsprint) was subject to Congressional regulation, the Court held that the products remained `in commerce' because they had been ordered pursuant to preexisting contracts or understandings with customers. Under such circumstances,
"`a break in their physical continuity of transit is not controlling. If there is a practical continuity of movement from the manufacturers or suppliers without the state, through respondent's warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse. The fact that respondent may treat the goods as stock in trade or the circumstance that title to the goods passes to respondent on the intermediate delivery does not mean that the interstate journey ends at the warehouse. The contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate movement should terminate.'
"317 U.S. at 568-69, 63 S.Ct. 332. Walling stands for the proposition that temporary stops in an interstate journey of merchandise to a predetermined destination do not necessarily interrupt the *476 flow of commerce. See, e.g., Stewart Jordan Distrib. Co. v. Tobin, 210 F.2d 427 (5th Cir.), cert. denied, 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136 (1954).
"This Court's decision of September 22[, 2000] is consistent with the principles described in Walling. The newspapers distributed by Stewart and Hyde were subject to preexisting orders in the form of subscriptions. Those subscriptions required that Stewart and Hyde deliver news, features, news magazines, and commercial advertising inserts (all of the `preprints, supplements, and inserts' designated for delivery pursuant to their agreements) in a timely manner on the day of publication to the subscriber. Much of the news content, many of the photographs, and virtually all of the news magazines, special features, and commercial advertising inserts were published and prepared in their entirety outside of Alabama for distribution to the subscriber. As the United States Supreme Court found in Walling, the preexisting orderthe subscriptionby the ultimate subscriber `indicates where it is intended that the interstate movement should terminate.' Walling v. Jacksonville Paper Co., 317 U.S. 564, 568-69, 63 S.Ct. 332, 87 L.Ed. 460 (1943). To find that the purpose for the production of such news and advertising was for it to be delivered to The News would be to `allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce.' 317 U.S. at 567-68, 63 S.Ct. 332.
"The conclusion reached in this case concerning the intrastate distribution of news, features, and commercial advertising moving in interstate commerce is consistent with the conclusions reached by other courts.* In 1998, for example, the United States District Court for the Middle District of Georgia found that district managers of a newspaper `engaged in' interstate commerce when they delivered newspapers to readers. The court held that, because the newspapers contained supplements and other material printed outside of Georgia, the district managers became part of a `practical continuity of movement' of interstate commerce when they delivered the newspapers to readers within Georgia. Webb v. Athens Newspapers, Inc., 999 F.Supp. 1464 (M.D.Ga.1998). In 1972, the United States District Court for the Central District of California found that a news dealer was an inseparable part of the flow of interstate commerce because the newspaper he distributed contained news, feature material, comics, and other information that had moved in interstate commerce. Dahl v. Hearst Corp., [No. 72-2107, December 13, 1972] (C.D.Cal.1972) [not published in F.Supp.]; see also Wirtz v. Universal Adver. Serv., 258 F.Supp. 542 (N.D.Okla.1966) (similar holding with respect to the distribution of advertising circulars, handbills, and similar printed matter).
"In summary, Stewart and Hyde have not pointed to any misapprehension of fact or law on the part of this Court. The opinion of September 22 is not at odds with Sisters of the Visitation, because this Court properly found that Stewart and Hyde were integral and inseparable parts of the flow of interstate commerce.
* "The decisions of the United States Supreme Court in Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), and that of the [United States Court of Appeals for the] Third Circuit in Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey, 263 F.2d 715 (3d Cir.1959), cert. denied, 360 U.S. 929, 79 S.Ct. 1449, 3 L.Ed.2d 1544 (1959), are hardly the *477 relics that Stewart and Hyde would have this Court believe."
NOTES
[1] We note that we have carefully examined all of the cases cited by the plaintiffs in support of their contention that the flow of interstate commerce ended when the inserts and the news were delivered to The News. We find those cases to be either distinguishable on their facts or otherwise consistent with the holdings in Lorain and Evening News.
[2] Justice Houston's special concurrence attempts to distinguish Sisters of the Visitation on the ground that it has no applicability in a case "involving an activity in which the flow of commerce must continue in order to fulfill the purpose of the activity." 786 So.2d at 469. I respectfully submit that such reasoning erroneously conflates the purpose of the statute and the purpose of the activity.